# United States Court of Appeals
## For the First Circuit

No. 14-1988

TORREY HARRISON,

Plaintiff-Appellant,

v.

GRANITE BAY CARE, INC.,

Defendant-Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, Senior U.S. District Judge]

Before

Howard, Chief Judge,
Thompson and Barron, Circuit Judges.

Maria Fox, with whom Mittelasen, LLC was on brief, for appellant.
Timothy J. O'Brien, with whom Tyler J. Smith and Libby O'Brien Kingsley & Champion, LLC were on brief, for appellee.
Barbara Archer, Esq. on brief for Amicus Curiae Maine Human Rights Commission.
Jeffrey Neil Young and Johnson, Webbert & Yound, LLP on brief for Amici Curiae Maine State Employees Association and Maine Employment Lawyers Association.
Jeffrey Neil Young, David G. Webbert, and Johnson, Webbert & Young, LLP on brief for Amici Curiae Maine State Employees Association, Maine Education Association, Maine Employment Lawyers Association, and National Association of Social Workers and its Maine Chapter.

January 13, 2016

**THOMPSON**, **Circuit Judge**.  This case requires us to, once again, interpret and apply Maine's Whistleblower Protection Act, Me. Rev. Stat. tit. 26, § 833.  Appellant Torrey Harrison ("Harrison"), a social worker, wants to be able to tell a jury that appellee Granite Bay Care, Inc. ("Granite Bay") illegally fired her in violation of that statute.  Her theory is Granite Bay was getting back at her for reporting what she considered to be violations of state employment law to her supervisor and, later, to Maine's Department of Health and Human Services ("DHHS").  She found herself stymied when, relying on a supposed "job duties exception" we carved out in Winslow v. Aroostook County, 736 F.3d 23 (1st Cir. 2013), the district court said that Harrison's reports do not qualify for whistleblower protection.

Today, after clearing the decks of a jurisdictional issue, we'll explain why Winslow doesn't hand Granite Bay an automatic victory on the facts in this record.

## JURISDICTION

We first address whether we have diversity jurisdiction. See 28 U.S.C. § 1332(a)(1) (extending federal jurisdiction to civil actions between "citizens of different states"); see also American Fiber & Finishing, Inc. v. Tyco Healthcare Group, LP, 362 F.3d 136, 139 (1st Cir. 2004) ("Federal courts are expected to monitor their jurisdictional boundaries vigilantly and to guard carefully against expansion by distended judicial interpretation.").

Harrison, a Maine citizen, filed her suit (which raises state law claims only) in Maine Superior Court. Granite Bay evidently preferred to be in federal court and, invoking federal diversity jurisdiction, removed the action to the Maine district court. In doing so, Granite Bay held itself out as a New Hampshire corporation with a principal place of business in Concord, New Hampshire. Neither Harrison nor the district court challenged the jurisdictional claims.

"Even though the parties have assumed the existence of appellate jurisdiction, we enjoy no comparable luxury." Espinal-Dominguez v. Com. of P.R., 352 F.3d 490, 495 (1st Cir. 2003). Far from it. "[W]e have an unflagging obligation to notice jurisdictional defects and to pursue them on our own initiative." Id. (citing cases); see also United States v. Horn, 29 F.3d 758, 768 (1st Cir. 1994) ("Parties cannot confer subject matter jurisdiction on either a trial or an appellate court by indolence, oversight, acquiescence, or consent.").

Our review of the record and our judicial notice of Granite Bay's filings in another case in the Maine district court, see Affo v. Granite Bay Care, Inc. et al., No. 11-cv-482, 2013 WL 2383627 (D. Me. 2013), raised a question as to whether Granite Bay is a citizen of both New Hampshire and Maine. If it is, this would make the parties non-diverse and render federal jurisdiction phantasmal. We ordered the parties to brief the jurisdiction issue

and provided an opportunity for them to submit evidence supporting their position. Based on the additional briefing and our thorough consideration of the issue, we are now satisfied that we have jurisdiction. Certainly, nothing in the additional evidence provided demonstrates a basis for any jurisdictional concern.[1]

## 1. Jurisdictional Facts

Granite Bay runs group homes and provides services for adults who have cognitive or physical disabilities. Granite Bay is a New Hampshire corporation, and it maintains its corporate headquarters in Concord.[2] Nevertheless, its group homes are all in Maine and all of its clients are Maine residents. In addition to its Concord headquarters, Granite Bay has an administrative office in Portland, Maine.

---

[1] Harrison does not contend that her whistleblower claim fails to meet the $75,000 amount in controversy requirement. See 28 U.S.C. § 1332(a). Her complaint presents claims for compensatory and punitive damages pursuant to Maine law, along with "reinstatement, appropriate back pay, and reimbursement for lost health, social security, and other benefits." Given that over five years have elapsed since Harrison's December 2010 termination, we have no reason to believe this case does not clear the amount in controversy threshold. See Coventry Sewage Assocs. v. Dworkin Realty Co., 71 F.3d 1, 6 (1st Cir. 1995) (discussing how, when a plaintiff's damages claim is made in good faith, the amount in controversy requirement is satisfied unless "the face of the complaint reveals, to a legal certainty, that the controversy cannot involve the requisite amount").

[2] When we talk about Concord, we mean the city in New Hampshire, not the town in Massachusetts.

- 5 -

Granite Bay is owned by two individuals, Kasai Mumpini and Caroletta Alicea, both of whom work out of Concord. Since at least 2009, Mumpini has served as the corporation's President, with Alicea as its Vice President. Mumpini and Alicea are Granite Bay's only two officers. And they're the only corporate directors, to boot. Their role is to maintain a vision for where the company is going, and to set overall corporate policies.

Granite Bay's day-to-day operations -- things like providing care to its clients and hiring, training, and supervising employees -- are handled out of the Portland office. An employee with the title of State Director runs the show in Maine. Since 2009, there have been two State Directors, Gregory Robinson and Ken Olson, and there are no significant differences between how each one went about the job. Olson, the current State Director, divides his work week between the offices in Portland and Concord.

Although he has "significant flexibility" in managing Granite Bay, Olson nevertheless reports to Mumpini and Alicea. Indeed, he communicates with them daily and meets with them in person at least once per week. Olson keeps the owners updated as to how Granite Bay is doing, and the owners direct him on the overall strategy he should employ in working towards the company's future goals. Furthermore, they give Olson "general financial parameters" in which he may operate, and they give him different objectives to accomplish.

The previous State Director, Robinson, held that position for about seven years before becoming Granite Bay's Chief Operations Officer. He described C.O.O. as a "transition title," and after some time Granite Bay's owners told him they "were eliminating the position." Following this, he began working for a separate company, Granite Bay Connections, which was also owned by Mumpini and Alicea and provided similar services as Granite Bay did, but to adults in New Hampshire.

Although the parties have submitted additional facts, including ones from the Affo case, these are enough for us to get on with the jurisdictional inquiry.

## 2. Nerve Center Jurisdictional Test

No one doubts that Granite Bay is a citizen of New Hampshire. After all, when it comes to questions of diversity jurisdiction, "a corporation shall be deemed to be a citizen of every State . . . by which it has been incorporated." 28 U.S.C. § 1332(c)(1). What we have to worry about is the location of its principal place of business. See id. (providing that a corporation is a citizen of the state where it has its principal place of business). Is Granite Bay's in New Hampshire or Maine?

Some basics first. Because this case does not present a federal question, the parties' diversity of citizenship is the only hook for federal jurisdiction. See 28 U.S.C. § 1332(a). "For federal jurisdictional purposes, diversity of citizenship must be

determined as of the time of suit."  Valentin v. Hospital Bella Vista, 254 F.3d 358, 361 (1st Cir. 2001).  Here, because Granite Bay removed Harrison's state court case to federal court, we look at the date of removal instead of the date on which the complaint was filed.[3]  See Casas Office Machines, Inc. v. Mita Copystar America, Inc., 42 F.3d 668, 673 (1st Cir. 1994).

Several years ago, the Supreme Court established beyond any doubt that federal courts must employ the "nerve center" test to determine the location of a corporation's principal place of business.  See Hertz Corp. v. Friend, 559 U.S. 77, 80-81 (2010).[4] The test is straightforward.  A corporation's "nerve center" (i.e., its principal place of business) is the particular location from which its "officers direct, control, and coordinate the corporation's activities."  Id. at 92-93.  Generally speaking, this will "be the place where the corporation maintains its headquarters -- provided that the headquarters is the actual center

---

[3] Nevertheless, neither party claims that anything bearing on our analysis has changed between the date of removal and today.

[4] In doing so, the Court overruled our application of the "locus of operations test," which we applied where "the bulk of [a company's] physical operations [were] in one state," even though "the corporation's executive offices [were] in another state." Diaz-Rodriguez v. Pep Boys Corp., 410 F.3d 56, 61 (1st Cir. 2005). Under that approach, we focused not on the location of a company's administrative or executive operations, but on its day-to-day operations.  The Supreme Court explicitly rejected this approach in Hertz.  See Hertz Corp., 559 U.S. at 90-91 (describing our inquiry as "focused more heavily on where a corporation's actual business activities are located").

of direction, control, and coordination . . . and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion)."  Id. at 93.

The party seeking to establish diversity jurisdiction bears the burden of persuasion, and parties must support their jurisdictional allegations with "competent proof."  See id. at 96-97 (citing McNutt v. General Motors Acceptance Corp., 289 U.S. 178, 189 (1936)).  Although the Supreme Court did not go into depth about the exact quantum of proof required to meet the burden of persuasion, it made it clear that run-of-the-mill corporate filings -- like a Form 10-K -- are not enough on their own to satisfy it.  Id. at 97.

The Hertz Court recognized that, "in this era of telecommuting, some corporations may divide their command and coordinating functions among officers who work at several different locations, perhaps communicating over the Internet."  Id. at 95-96.  But even when presented with such a situation, the nerve center test "nonetheless points courts in a single direction, towards the center of overall direction, control, and coordination."  Id. at 96.  Federal courts must also be on the lookout for attempts at "jurisdictional manipulation."  Id. at 97.  Therefore, "if the record reveals attempts at manipulation -- for example, that the alleged 'nerve center' is nothing more than a

mail drop box, a bare office with a computer, or the location of an annual executive retreat -- the courts should instead take as the 'nerve center' the place of actual direction, control, and coordination, in the absence of such manipulation."  Id.

The test may seem pretty simple, and it is.  That's no accident.  "Complex jurisdictional tests complicate a case, eating up time and money as the parties litigate, not the merits of their claims, but which court is the right court to decide those claims."  Id. at 94.  Complicated tests also engender appeals, "encourage gamesmanship, and . . . diminish the likelihood that results and settlements will reflect a claim's legal and factual merits," not to mention demand the expenditure of judicial resources.  Id.  Accordingly, the test described by the Supreme Court is intended to be "relatively easier to apply" than others that could be imagined.[5]  Id. at 96.

At its heart, the nerve center test is an inquiry to find the one location from which a corporation is ultimately controlled.  Put slightly differently, the federal court is to look for the place where the buck stops.  And where it does, well, that's the corporation's nerve center and principal place of business.

_____

[5] Like Diaz-Rodriguez's locus of operations test, under which we think the jurisdictional question would have been extraordinarily close on the facts in this record.

- 10 -

### 3. Analysis

Each party has had a full and fair opportunity to submit evidence and arguments about the jurisdictional issue. Neither has asked us to send the case back to the district court for jurisdictional discovery or an evidentiary hearing. We think the facts in the record are sufficient for us to determine, without remanding for an evidentiary hearing, that jurisdiction is proper. See Valentin, 254 F.3d at 364 (noting the "key considerations" in resolving a jurisdictional dispute on the papers are "whether the parties have had a full and fair opportunity to present relevant facts and arguments, and whether either party seasonably requested an evidentiary hearing"). The competent evidence points towards Concord as Granite Bay's principal place of business.

Harrison does not contest (or seek to develop additional evidence to contest) that Granite Bay's owners, although they may be hands-off when it comes to day-to-day decisions, exercise "ultimate" control over Granite Bay, and that they do so from Concord. Granite Bay has supported this assertion through affidavits and sworn deposition testimony showing that the owners set overall corporate policy and goals, plus advised and gave instructions to the State Director as to how to make the owners' vision a reality.

Moreover, the uncontested evidence shows that the owners make the call as to just who exactly will be placed in what upper

- 11 -

management position.  For example, they moved Robinson from State Director in Maine to Chief Operating Officer, then eliminated that position and transitioned him to a different one.  This is a concrete example of the owners' actual exercise of control over Granite Bay.  And all of the evidence indicates this ultimate control is wielded from Granite Bay's Concord headquarters.

In sum, the competent evidence in the record establishes that Granite Bay's principal place of business is in Concord, not Portland.  Accordingly, the parties are diverse, we have jurisdiction, and we may proceed to the merits.[6]

### FACTS

This is where Harrison finally enters the scene.  We recite contested facts in the light most favorable to Harrison, the non-moving party at summary judgment.  Ponte v. Steelcase Inc., 741 F.3d 310, 313 (1st Cir. 2014).

Harrison, a Licensed Clinical Social Worker ("LCSW"), worked for Granite Bay from March through December of 2010.  During her time there, Harrison served as Granite Bay's Training Director, a position which placed her into the senior management team.  She reported to the Operations Director, Ken Olson who, in turn, reported to State Director Greg Robinson.

---

[6] That our Hertz analysis is much more straightforward than it would have been under Diaz-Rodriguez's overruled "locus test" is, we think, an indication that we are applying the Supreme Court's test in the way it intended.

- 12 -

As Training Director, Harrison was responsible for managing Granite Bay's training department and conducting training sessions for employees. She performed her job duties "very well" and was an "excellent" trainer for Granite Bay.

Harrison, like other LCSWs, is a "mandated reporter" under Maine law. A mandated reporter is (as particularly relevant to this case) someone who, by virtue of her profession, is in contact with "incapacitated or dependent adult[s]." Me. Rev. Stat. tit. 22, § 3477(1). A mandated reporter like Harrison is required to immediately file a report with Maine's DHHS if she "knows or has reasonable cause to suspect" that a dependent adult "has been or is likely to be abused, neglected or exploited." Id.

In May of 2010, something going on at Granite Bay rubbed Harrison the wrong way. She discovered that one of Granite Bay's clients (a "dependent adult" under Maine law) who did office and maintenance work for Granite Bay wasn't getting paid on time for his services. Harrison expressed concern to her supervisor, Olson.

But speaking with Olson did not have the desired effect. Granite Bay's client-worker continued to not be paid on time, so Harrison initiated a follow-up conversation with Olson in August. This time Harrison also told him that not paying this gentleman for his work fell under the rubric of exploitation of a dependent adult. She reminded Olson that she is a mandated reporter and told him that she did not want to have to report what had been

- 13 -

going on to DHHS.  Olson never responded to Harrison's concerns, and the worker in question was not paid in full for his work over a period of approximately three months.

In mid-September 2010, Harrison learned that clients living in two of Granite Bay's group homes had had their electricity shut off.  This happened, she believed, because Granite Bay failed to pay the electric bills.  Harrison then discovered that another resident -- whose behavior plan required alarmed windows to notify staff if he left the home that way -- was at risk because faulty windows made it impossible to install alarms. She also learned that the Portland office was understaffed.  As it turned out, an office that called for five employees (four Program Managers and one Area Director) was being run with only two.

Troubled by what she'd learned, Harrison contacted two of her LCSW colleagues to sound them out on whether she had to report any or all of these issues to DHHS.  Each one advised Harrison that, yes, she should report her concerns.  We also note here that one of Granite Bay's internal policies specifically provided that mandated reporters such as Harrison should file a report with DHHS directly, without going to their own supervisor first, unless it was an "emergency crisis."

So it was that, on September 16, 2010, after apparently concluding that further complaints to Granite Bay would be no more effective than herding cats, Harrison went to DHHS with her

suspicions of neglect and exploitation. She informed DHHS about Granite Bay's failure to pay its client-worker, the electricity shutoffs at group homes, the lack of required window alarms for one client, and understaffing in the Portland office. Granite Bay admits that it did not pay its client-worker in full until after Harrison's report to DHHS.

When she went into work the next day, Harrison told Olson what she'd done. Shortly after that, she emailed a summary of her report to one of the owners, Mumpini. In the email, Harrison expressed a fear that Robinson (the State Director) wouldn't deal with what Harrison thought were "systemic issues," and would instead resort (as she'd seen happen before) to intimidating people and issuing "corrective actions" to his underlings. Mumpini instructed Robinson to meet with Harrison to discuss her DHHS report, but he never did. What did happen was that Olson called Harrison into a meeting (Granite Bay's Human Resources Director was there, too) and admonished her for failing to follow the "chain of command" by sending a summary of the DHHS report to Mumpini rather than Olson, who she reported to. During that meeting, Olson told her the issues raised in her report were "being addressed" and that he had no other complaints about her job performance.

Despite Olson's assurances about her good job performance, Harrison felt she was treated differently by her bosses after her DHHS report. Olson ignored her, wouldn't make

eye contact, rolled his eyes when he heard her name mentioned, marginalized her, and became less responsive to emails. On one occasion, Harrison was in a colleague's office, having a conversation with her. Olson came in, sat down across from Harrison without looking at her, and began chatting with Harrison's colleague. When Harrison said "hello" to him, Olson got up and walked out of the office. Harrison described this as an example of the "marked change" in their relationship after she filed her DHHS report.

And Harrison had little contact with Robinson after her report. Indeed, Robinson cancelled a meeting with her that had been scheduled for the end of September, where they were supposed to talk about revising the training policy. Robinson did not reschedule the meeting, opting instead to revise the training policy without any input from Harrison. Furthermore, Olson and Robinson met regularly and discussed Harrison in a negative manner.[7]

Things continued, apparently in a similar vein, until December 2, 2010, when Harrison attended a meeting of Granite Bay's senior managers. The meeting was physically held in the Portland office, but it involved personnel from Concord, who participated

---

[7] Other Granite Bay managers, however, found Harrison to be very professional, good to work with, and helpful at solving problems.

via video teleconference.  Before the meeting began, Harrison and several other employees from the Portland office were chatting, apparently unaware the video and audio feeds were up and running in Concord.  When Robinson went into the conference room in Concord, he could hear Harrison talking to the other employees in Portland.

Harrison, it turned out, was talking about Robinson and the way he'd been running Granite Bay.  Robinson heard her tell the others that he had a "dictatorial" leadership style, that he was an obstruction that needed to be removed, and that Granite Bay could perhaps move to a "consensus building" model (as opposed to having just one person developing policy) if Robinson were out of the picture.  Although Harrison is the one that Robinson says he heard, she was not dominating the meeting, leading the discussion or speaking more than the others.  Indeed, during the back and forth, she shared her feeling that training had been impacted by a lack of support from upper management towards teamwork development, answered a question from another manager about training recertification, and commented that prior to working for Granite Bay, she'd had experience in other organizations in which more than one person formulated policies.  She didn't phrase her comments in a negative manner, and none of the substance should have been new to Robinson either, as she had already discussed these issues with him and Olson.

Furthermore, at some point during this discussion, Robinson texted words to the effect of "I hear you" to one of the participants. He did not, however, text Harrison to warn her that he could hear what was being said.

Just days later, December 6, Olson (and the HR Director) again met with Harrison. By the end of this meeting, she found herself out of a job. Harrison asked why she was being terminated, and in response the HR Director told her that Granite Bay did not have to give her a reason. She was, however, given a letter stating she was fired for "creating disharmony in the workplace." In its appeal brief, Granite Bay put it this way: "Harrison's discharge was the result of an emotional response to an impromptu instance of insubordination" on December 2.

Aggrieved by her termination, Harrison filed suit. She alleged Granite Bay illegally retaliated against her, with the payback culminating in her December 6 sacking, as a result of having filed those exploitation reports with DHHS in September. Harrison claimed she was entitled to whistleblower protection for the DHHS report, as well as the initial reports she made to Olson before she went to DHHS.

Granite Bay said, however, that because its internal policies require LCSWs like Harrison to make DHHS reports and because Maine law itself requires mandated reporters like her to report suspected exploitation, making such reports to DHHS was,

simply put, part of her job.  Granite Bay pointed to Winslow's "job duties exception" and argued that, as a matter of law, Harrison falls squarely within that exception.  And so, it concluded, Harrison does not qualify for protection under the Whistleblower Act, making Granite Bay's motive for firing her irrelevant.

Granite Bay's motion for summary judgment on those grounds was referred to a magistrate judge.  Agreeing with Granite Bay's take on Winslow, the magistrate judge concluded that none of her reports constituted "protected activity" within the meaning of the Whistleblower Protection Act.  The district judge reviewed the magistrate's decision de novo and came to the same conclusion.  Accordingly, the district judge allowed Granite Bay's motion for summary judgment on the grounds that she had not, thanks to Winslow's job duties exception, engaged in protected whistleblowing activity.[8]  This timely appeal followed.

---

[8] Along the way, Harrison moved to certify questions of state law to the Maine Supreme Judicial Court sitting as the Law Court. The district judge denied this motion, observing that, "[i]f the Winslow language potentially misconstrues the Maine statute such that the issue should be certified to the Maine Law Court, that . . . is a decision for the First Circuit."  On appeal, Harrison renews her request for certification.  We gratefully acknowledge the amicus brief filed by the Maine State Employees Association and Maine Employment Lawyers Association, along with the separate brief filed by the Maine State Employees Association, Maine Education Association, Maine Employment Lawyers Association, and National Association Of Social Workers And Its Maine Chapter [sic], both of which addressed the certification question.  Ultimately, however, we do not find certification necessary.

**STANDARD OF REVIEW**

We review "the district court's grant of summary judgment . . . de novo, and we draw all reasonable inferences in favor of the nonmoving party." Ponte, 741 F.3d at 319. Here, of course, the party getting the benefit of reasonable inferences is Harrison. We affirm only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

**ANALYSIS[9]**

Because this is a diversity case, the substantive law of Maine controls. The relevant provisions of Maine's Whistleblower Protection Act[10] provide the following:

> Discrimination against certain employees prohibited
>
> 1. DISCRIMINATION PROHIBITED. No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because:
>
> A. The employee, acting in good faith, or a person acting on behalf of the employee, reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this

---

[9] We acknowledge and thank Amicus Curiae Maine Human Rights Commission for its cogent and informative amicus brief.

[10] We'll refer to the statute as either the Whistleblower Act or sometimes as just the Act.

State, a political subdivision of this State or the United States;[11]

. . .

2. INITIAL REPORT TO EMPLOYER REQUIRED; EXCEPTION.

Subsection 1 does not apply to an employee who has reported or caused to be reported a violation, or unsafe condition or practice to a public body, unless the employee has first brought the alleged violation, condition or practice to the attention of a person having supervisory authority with the employer and has allowed the employer a reasonable opportunity to correct that violation, condition or practice.

Prior notice to an employer is not required if the employee has specific reason to believe that reports to the employer will not result in promptly correcting the violation, condition or practice.

3. REPORTS OF SUSPECTED ABUSE.

An employee required to report suspected abuse, neglect or exploitation under Title 22, section 3477 or 4011-A, shall follow the requirements of those sections under those circumstances. No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee followed the requirements of those sections.

Me. Rev. Stat. tit. 26, § 833. The parties do not dispute that Harrison, as a mandated reporter, is "[a]n employee required to report suspected abuse, neglect or exploitation" within the

---

[11] This section goes on to list four other protected activities, none of which is alleged to be relevant here.

- 21 -

meaning of § 833(3). See generally Me. Rev. Stat. tit. 22, § 3477 (requiring social workers to report suspected exploitation of incapacitated or dependent adults to DHHS).

Maine's Law Court has explained the three elements of a successful Whistleblower Act claim: a plaintiff must show that (1) she engaged in activity protected by the statute; (2) she suffered an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action. Costain v. Sunbury Primary Care, P.A., 954 A.2d 1051, 1053 (Me. 2008). Further, "Maine law provides a private right of action for a violation of the [Act],"[12] Murray v. Kindred Nursing Centers West LLC, 789 F.3d 20, 25 (1st Cir. 2015) (citing Me. Rev. Stat. tit. 5, §§ 4572(1)(A), 4621; Costain, 954 A.2d at 1053 & n.2), so Harrison has standing.

The parties' flagship arguments are derived not from the language of the Act itself, but from their interpretations of Winslow's effect on the first prong of a Whistleblower Act claim, which requires a showing that the employee engaged in protected

---

[12] Technically, the Whistleblower Act does not actually grant an employee a cause of action. It is the Maine Human Rights Act that "provides a right of action to persons who have been subject to unlawful discrimination, including whistleblowers who have suffered retaliatory discharge or other adverse employment actions." Costain, 954 A.2d at 1053. Though the Human Rights Act is the source of an employee's "right of action," id., "the requirements that must be met for an action to be afforded protection stem from the [Whistleblower Act]," id. at 1053 n.2.

activity.  In fact, the parties have framed this appeal even more narrowly as presenting the question whether Winslow, when applied here, entitles Granite Bay to judgment as a matter of law.  So we focus our attention on this specific question.

Granite Bay believes Winslow -- which did not involve a whistleblower claim made by a mandated reporter like Harrison -- stands for the proposition that the Whistleblower Act provides no protection for an employee whose official job description and responsibilities include reporting illegalities (or suspected illegalities) internally or to the government.  Granite Bay directs our attention to its internal policies requiring all employees to report suspected exploitation of dependent adults.  From this, Granite Bay concludes that Harrison's reports were nothing more than "part and parcel" of her job responsibilities notwithstanding any statutory reporting mandate applicable to her, and so she can't get Whistleblower Act protection based on Winslow's carve-out.

Harrison, too, assumes Winslow recognized a job duties exception, but she says the exception doesn't apply to mandated reporters.  In her view, this is because the Whistleblower Act's § 833(3) expressly provides specifically-tailored protections for mandated reporters like herself[13] and, as importantly, the Act's

_____

[13] Section 833(3) applies to employees "required to report suspected abuse, neglect or exploitation under Title 22, section 3477 or 4011-A," and states that "[n]o employer may discharge, threaten or otherwise discriminate against an employee regarding

- 23 -

plain language does not include a job duties exception.  According to Harrison, the Maine Law Court implicitly held as much in the case of <u>Blake</u> v. <u>State</u>, 868 A.2d 234 (Me. 2005).[14]  Thus, in her view, reading a job duties exception into the statute would render meaningless the very protections explicitly written in by the Maine Legislature and acknowledged by Maine's highest court.

As a fallback, Harrison says that even if <u>Winslow</u>'s job duties exception applies to mandated reporters, it is not a blanket exception that an employer can lean on anytime it feels like it by creating internal policies generally requiring its employees to come forward to report a potential illegality.  Per Harrison, even under the broadest reading of <u>Winslow</u>, the job duties exception applies only to "employees whose regular job responsibilities include reporting the specific wrongdoing in question and/or whose supervisors directed them to make the report."  Appellant Br. at

the employee's compensation, terms, conditions, location or privileges of employment because the employee followed the requirements of those sections." Me. Rev. Stat. tit. 26, § 833(3). One of the two referenced statutes requires a social worker like Harrison to report to DHHS (under certain circumstances) when she "knows or has reasonable cause to suspect that an incapacitated or dependent adult has been or is likely to be abused, neglected or exploited."  <u>See</u> <u>id.</u> tit. 22, § 3477(1).  Granite Bay does not dispute that <u>Harrison</u> is required to report suspected abuse, neglect, or exploitation pursuant to § 3477.

[14] The logical conclusion of this argument, although not stated as such in Harrison's brief, is that <u>Blake</u> trumps <u>Winslow</u> to the extent there is any conflict between them.

- 24 -

18. Because no one told her to report to Olson or to DHHS, and because her "detailed job description does not include filing DHHS reports [on] any of the substantive issues she reported to DHHS," id. at 20, the job duties exception does not bar her claim.[15]

Harrison and Granite Bay clearly have different conceptions of what we held in Winslow. And neither they nor the district judge are the only ones in Maine to have read Winslow as enshrining a job duties exception to the Act. See, e.g., Pippin v. Boulevard Motel Corp., No. 14-cv-00167, 2015 WL 4647919 (D. Me. 2015). Yet, we never so much as uttered the phrase "job duties exception" in Winslow, and Granite Bay's arguments in particular are based on a distorted understanding of that case. Accordingly, we must dive back into Winslow to clarify what it does and does not stand for.

Our opinion in Winslow set forth its facts in pretty exacting detail, so we will repeat only those needed for our analysis. Winslow v. Aroostook County, 736 F.3d 23 (1st Cir.

_____

[15] Harrison's arguments rely exclusively on her reports (both internal and external) regarding the potential employment law violation, namely, Granite Bay's failure to pay its client-worker on time. She has opted to forgo any argument that her reports about the electricity shutoffs, missing window alarms, or understaffing in Portland count, too, so we deem waived any potential argument along those lines. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Thus, we focus solely on the wage issue.

2013), involved the Executive Director of Aroostook County's Local Area I Workforce Investment Board, a state-created entity that received and administered certain federal funds. 736 F.3d at 24-25. The Board had been set up in such a way that Winslow reported directly to the County instead of the Board itself. Id. at 25. Government regulators discovered this when they performed a compliance review and concluded the arrangement violated federal regulations: Winslow should have been reporting to the Board, not the County. Id.

The key facts for our purposes are that the government, not Winslow herself, uncovered the potential violation of federal policies, and the government brought this to the attention of Winslow and her supervisor. See id. Winslow's own supervisor took steps to notify the relevant decisionmakers in the County and with the Board. Id. He instructed Winslow to disseminate her notes of the very meeting at which the government advised them of the reporting snafu. Id. This was followed up with a public meeting at which the issue was discussed, and the meeting minutes were posted on the internet soon afterwards. Id. at 26.

In her suit, Winslow identified two communications she thought qualified for Whistleblower Act protection. The first was that email to Board members attaching her notes from the meeting with federal regulators at which they disclosed the problem. See id. at 25-26. The second was another email she sent to Board

- 26 -

members a couple weeks after the public meeting in which she expressed her thoughts about the situation. Id. In her suit, she alleged she was a whistleblower because the Board would not have known of the potential violation but for these two emails. Id. at 32.

We soundly rejected this argument based on the facts in the record. After all, the evidence showed that Winslow sent her first email not because she wanted to expose an illegality, but because her supervisor (who, don't forget, was aware of it as well) told her to. And she sent this first email to exactly the people she had been instructed to loop in on the situation. Thus, because the only evidence was that Winslow was doing what she was told, there was nothing from which a finder of fact could infer she personally intended to blow the whistle or expose an illegality by sending this particular email.

By the time she sent the second email, the problem had been discussed in a public forum and the minutes of the meeting had been posted online for all the world to see. Indeed, "the undisputed facts" made it clear that Winslow's supervisor, along with the County itself and others involved with the Investment Board, "were not trying to bury the problem of the violation" discovered and reported to them by the feds, "but to acknowledge it and deal with it." Id. at 32. Therefore, Winslow's second email, addressed as it was to individuals who were already (or who

easily could have become) aware of the problem, was clearly not intended to expose a potential illegality. Rather, Winslow's intent was to make sure her voice was heard and her opinion considered.

In sum, the lack of evidence in the record showing that Winslow was motivated by whistleblowing concerns, and not some broad-based job duties exception, is why we concluded no reasonable jury could find that she had engaged in protected whistleblowing activity.

Moreover, none of the cases we relied on in Winslow to buttress our reasoning espoused a judicially-created "job duties exception" to a whistleblower protection statute. Nor do any of those cases support concluding that the nature of an employee's job duties, standing alone, may make that employee ineligible as a matter of law for whistleblower protection. We'll explain.

Winslow cited the district court's decision in Capalbo v. Kris-Way Truck Leasing, Inc., 821 F. Supp. 2d 397, 419 (D. Me. 2011), for the proposition that "the usual rule in Maine is that a plaintiff's reports are not whistleblowing if it is part of his or her job responsibilities to make such reports, particularly when instructed to do so by a superior." Winslow, 736 F.3d at 32. Describing this as the "usual rule," however, is far from holding that an employee is, as a matter of law, wholly ineligible for

statutory whistleblower protection whenever her employer implements its own reporting requirements.

And Capalbo did not suggest that this should be so. In Capalbo, the district court reviewed the record evidence and concluded that "[n]o reasonable trier of fact could conclude that the reports . . . which [the employer] required of [the plaintiff], constituted conduct in opposition to an unlawful employment practice of [the employer]." Capalbo, 821 F. Supp. 2d at 419. We find the "in opposition to" concept and phraseology helpful in this arena because an employee who passes on information as nothing more than a required step of carrying out his or her job duties intends to do her job, not blow the whistle on a potential or actual illegality. Capalbo's review and analysis of the record evidence before it simply underscores the need to look at the unique facts of each case bearing on an employee's motivation in making a report that is later claimed to have constituted protected whistleblowing activity. It did not purport to recognize a broad job duties exception to the Act's protections. Thus, Winslow's citation to Capalbo cannot be construed as an endorsement of the job duties exception espoused by Granite Bay.

Furthermore, Winslow looked to several non-Maine cases as persuasive authority, but the reasoning in those cases does not support the creation of a job duties exception. We'll go through them one by one to explain why not.

Winslow first pointed to the Minnesota Supreme Court's opinion in Kidwell v. Sybaritic, Inc., 784 N.W.2d 220 (Minn. 2010), as standing for the proposition that, "when a company's in-house counsel advises the company on compliance issues, 'the lawyer is not sending a report for the purpose of exposing an illegality and the lawyer is not blowing the whistle.'" Winslow, 736 F.3d at 32 (quoting Kidwell, 784 N.W.2d at 231). The Minnesota court relied on the facts that the alleged whistleblowing consisted of an email that in-house counsel sent to members of management, and that he "had previously discussed legal matters" with each of these people. Kidwell, 784 N.W.2d at 230-31. Therefore, "no inference can be drawn that his purpose was other than to do his job" of advising his client. Id. at 231. The court was quick to point out that the plaintiff "presented no evidence that he sent the email to law enforcement or to the government," id., an observation which raises the possibility that a report along those lines (i.e., an external report) could have constituted protected whistleblowing activity.

Moreover, the Kidwell court made it clear that its conclusion was dictated by the facts in the record rather than a general exception to whistleblower protection. It began its analysis by "reject[ing] as too broad the . . . conclusion that, as a matter of law, an employee does not engage in protected conduct under the [Minnesota] whistleblower act if the employee makes a report in fulfillment of the duties of his or her job."

_Id._ at 226-27 (internal quotation marks omitted).  The court also stated in no uncertain terms that, while the nature of an employee's job duties may have some bearing on whether she had engaged in protected conduct, "the whistleblower statute does not contain a job duties exception."  _Id._ at 227 (emphasis added).

Obviously then, when we cited _Kidwell_ we did not thereby graft onto Maine's Whistleblower Act a job duties exception squarely rejected by that case.  Nor could we have relied on its reasoning to craft a job duties exception of our own making.

_Winslow_ next looked at a case out of the Federal Circuit interpreting the federal whistleblower protection act.  We described the case as holding that a plaintiff whose job was to monitor and report on farms' compliance with federal law "did no more than carry out his required everyday job responsibilities" when he reported some farms as being out of compliance with governmental conservation plans.  _Winslow_, 736 F.3d at 32 (quoting _Willis_ v. _Dep't of Agric._, 141 F.3d 1139, 1144 (Fed. Cir. 1998)).  In that case, the Federal Circuit recognized that the federal whistleblower protection act "is intended to protect government employees who risk their own personal job security for the advancement of the public good by disclosing abuses by government personnel."  _Willis_, 141 F.3d at 1144.  The plaintiff's job as a District Conservationist with the United States Department of Agriculture required him "to review the conservation compliance of

farms within his area." Id. The plaintiff inspected 77 farms, found that 16 of them were not in compliance with the USDA's conservation plans, and then tried to assert a whistleblower claim based upon his announcement of the non-compliance findings.

The court was unimpressed with the plaintiff's whistleblower claim and observed that, "[i]n reporting some of [the farms] as being out of compliance, he did no more than carry out his required everyday job responsibilities." Id. at 1144. Thus, "in no way did [his report] place [the plaintiff] at personal risk for the benefit of the public good and cannot itself constitute a protected disclosure under the [whistleblower protection act]." Id. In other words, the facts there would not have allowed the jury to find that the plaintiff was motivated by any desire to blow the proverbial whistle.

Finally, we cited our own opinion in Claudio-Gotay v. Becton Dickinson Caribe, Ltd., 375 F.3d 99, 102-03 (1st Cir. 2004), a case interpreting the Federal Fair Labor Standards Act ("FLSA") and involving reports of alleged overtime violations, to say that "an employee who reports violations of laws or other requirements as part of his job is not engaging in protected activity for the purposes of an anti-retaliation provision." Winslow, 736 F.3d at 32. But in Claudio-Gotay, the plaintiff's job duties "included approving invoices documenting the [employees'] hours worked and their corresponding pay," and when he reported potential

- 32 -

violations of the FLSA, he made them to his employer and "in furtherance of his job responsibilities." 375 F.3d at 102. The evidence in that case showed that he "was concerned with protecting [his employer], not asserting rights adverse to" it. Id. Accordingly, we concluded that he did not engage in protected activity under the FLSA. Id. at 103.

Importantly, none of these three cases relied on a generally-applicable exception to whistleblower protection. Kidwell expressly repudiated even the notion of such an exception. Instead, in each of these cases the court looked at the actual evidence speaking to an employee's motivation in making each report at issue. Each report was made internally, not to a governmental agency with oversight authority. The common refrain is that each plaintiff couldn't get whistleblower protection because he or she failed to present evidence that a report was made to shed light on and "in opposition to" an employer's potential illegal acts rather than as simply part of his or her everyday job duties.

So, having gone through our Winslow opinion and the cases on which we relied there, we can see that under Winslow -- properly understood -- the employee's motivation in making a report is critical. This reading of Winslow is in accordance with Maine law, as Maine's Law Court recently reaffirmed the importance of an employee's motivation in making a putatively-protected report. In Cormier v. Genesis Healthcare LLC, No. CUM-14-216, 2015 WL 8730694

(Me. Dec. 15, 2015), the court had the opportunity to discuss Section 833(1)(B) of the Act, which provides protection to a whistleblower who, "acting in good faith" reports "what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of any other individual."[16]  See id. at *3.  Maine's highest court explained that "[a] complaint is made in good faith if the employee's motivation is to stop a dangerous condition."  Id. (emphasis added).  We are, therefore, confident in our conclusion that the critical point when analyzing whether a plaintiff has made out the first element of a Whistleblower Act claim -- engaging in activity protected by the Act -- is an employee's motivation in making a particular report or complaint.

Thus, and although a particular employee's job duties may be relevant in discerning his or her actual motivation in reporting information, those duties are not dispositive of the question.  In other words, if an employee is just doing his or her job by passing information to others in the organization, he or she may not have intended to engage in protected whistleblowing activity by bringing to light an unlawful (or potentially unlawful) activity or occurrence.  This interpretation is, we believe,

---

[16] We note that this "good faith" requirement (which appears throughout Section 1 of the Act) is the only conceivable textual hook for a possible "job duties exception."

- 34 -

consistent not only with Cormier, but also with the policy goals underlying Maine's enactment of the Whistleblower Act. After all, and as we recognized in Winslow, the Act "embodies Maine's larger 'statutory public policy against discharge in retaliation for reporting illegal acts, a right to the discharged employee, and a remedial scheme to vindicate that right.'" Winslow, 736 F.3d at 30 (quoting Fuhrmann v. Staples Office Superstore E., Inc., 58 A.3d 1083, 1097 (Me. 2012)) (further citations omitted).

Indeed, we noted in Winslow that the plaintiff's emails were sent "either under direct instructions from" her supervisor (i.e., the first one) or "because she thought it was among her responsibilities to do so" (i.e., the second one letting everyone know what she thought about the situation). See 736 F.3d at 32. With respect to the first email, Winslow did not go out on a limb and risk her job by complying with her supervisor's instructions, see Willis, 141 F.3d at 1143 (observing that the federal whistleblower act "is designed to protect employees who risk their own personal job security for the benefit of the public"), and there was no evidence to conclude that either email constituted conduct "in opposition to" an unlawful employment practice, see Capalbo, 821 F. Supp. 2d at 419. At bottom, we upheld summary judgment in Winslow not because of a job duties exception, but because Winslow failed to come forward with evidence from which a

reasonable jury could conclude that she had intended to engage in any protected whistleblower conduct.

Now, getting back to Harrison's claim, it is apparent that the district court (working, of course, without the benefit of the Maine Law Court's Cormier opinion) simply misunderstood, perhaps understandably so, what we actually held in Winslow. Proceeding from its view that Winslow turned on the nature of the plaintiff's job duties, the district court concluded that Harrison is not entitled to whistleblower protection thanks to the uncontested evidence that Granite Bay's reporting policies are applicable to all employees. As such, the judge did not find it necessary to analyze the record evidence bearing on Harrison's motivation in making her internal and DHHS reports. But the existence of such a general reporting policy, though perhaps relevant, is not dispositive on the question of whether a plaintiff has engaged in protected whistleblowing activity. The district judge's erroneous shortcutting of the analysis requires us to remand for the district court to re-analyze Harrison's claims with the aid of today's clarification of Winslow.[17]

---

[17] Our explanation of Winslow renders it unnecessary for us to consider Granite Bay's or Harrison's other arguments premised on the existence of a job duties exception. Specifically, we have no need to determine under which specific section of the Act -- Section 1 or Section 3 -- Harrison's claims fall, or whether some reports are governed by Section 1 and others by Section 3. Because these questions are beyond the scope of what we decide today, we do not address whether or how our reasoning in Winslow,

Before concluding, we note that Granite Bay also relies on the long-standing principle that we may affirm a result on any grounds supported by the record. In doing so, it argues that Harrison's claim nevertheless fails for lack of evidence on the third prong. That is, Granite Bay says Harrison has not come forward with evidence that would allow a reasonable jury to find a causal connection between any protected whistleblowing activity and her termination.

Harrison disagrees. She argues that the relatively short time that elapsed between her reports and her termination goes towards showing that she was fired because of her protected activity. She also tells us the evidence shows that her concerns were ignored; that she experienced shoddy treatment from Olson and Robinson following her DHHS report; that when Robinson finally did sit down with her, it was not to discuss the substance of her concerns (as Mumpini had instructed him to do) but to admonish her for emailing Mumpini to let him know of her report; and that she was singled out for termination after the December meeting, even though she was just one of multiple people participating in the conversation and despite Granite Bay having told her that she was doing good work. Harrison believes these facts, when viewed

---

which was confined to Section 1 claims, see 736 F.3d at 30, may bear on the analysis of a mandated reporter's claim for whistleblower protection under the Act's Section 3.

together, would allow a jury to conclude that Granite Bay terminated her as payback for her protected activity in violation of the Act.

We do not reach these arguments in light of our conclusion that the district court committed an error of law with respect to its analysis of the first prong of Harrison's claim. Because this error requires a "re-do" on the first prong, it makes no sense for us to skip ahead and talk about the third. And we decline to do so.

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgement is **vacated** and this matter is **remanded** for further proceedings consistent with this opinion. Costs are awarded to appellant.