

STATE OF MAINE                          BUSINESS AND CONSUMER DOCKET
PENOBSCOTT, ss.                     DOCKET NO. BCD - CV - 15 - 29

SANDRA GAGNON,             )
                               )
          Plaintiff,        )      ORDER ON DEFENDANT'S
    v.                       )      MOTION FOR SUMMARY
                               )      JUDGMENT
WOODLANDS SENIOR LIVING  )
OF BREWER, LLC,           )
                               )
         Defendant.      )

I.      Background

      A. Improper Administration of Medication

      Plaintiff Gagnon was hired by Defendant Woodlands Senior Living of Brewer, LLC ("Woodlands") as a Certified Residential Medication Aide ("CRMA") on November 26, 2012. Supp. SMF ¶¶ 3 & 4. During her employment, Gagnon received regular pay raises. Add. SMF ¶ 3. In January 2014, Gagnon's supervisor, Chelsea Hodgson, completed a performance evaluation for Gagnon noting that Gagnon's performance was good in all respects. Add. SMF ¶ 5. The parties agree that the residents seemed to like Gagnon. Add. SMF ¶ 8. Her employment was terminated on May 5, 2014. Supp. SMF ¶ 34. During her employment, Gagnon's job responsibilities included administering medications to Woodlands' residents and documenting the care received. Supp. SMF ¶ 5. During her employment, Gagnon was trained in Woodlands' policies and procedures regarding administration of medications including Woodlands' policy requiring CRMAs to perform three checks prior to administering medications and Woodlands electronic medication administration records

1

("EMAR"). Supp. SMF ¶¶ 6, 7 & 8. Gagnon also received training on the Department of Health and Human Services' ("DHHS") Eight Rights of Safe Medication Administration. Supp. SMF ¶ 9.

On April 1, 2013, Gagnon received a medication error counseling session for having multiple errors in the month of February 2013. Supp. SMF ¶ 10. Gagnon's errors were a result of Gagnon's failure to correctly document the administration of medications. Supp. SMF ¶ 11. On April 10, 2014, Gagnon received a medication error warning signed by Woodlands' Executive Director, Benjamin Smith, for administering the incorrect vitamins to a resident on numerous dates between March 5 and April 9, 2014. Supp. SMF ¶ 13. The warning stated that any additional medication errors by Gagnon would result in her removal from medication passing duties and/or future disciplinary action up to and including termination. Supp. SMF ¶ 16. Gagnon understood the steps she would need to take in order to avoid similar mistakes in the future. Supp. SMF ¶ 15.

On April 29, 2014, Gagnon administered a blood pressure medication (Metroprolol Tartate) to a resident in an amount that was four times the amount prescribed. Supp. SMF ¶ 19. Hodgson, discovered the error the next day on April 30, 2014. Supp. SMF ¶ 20. The parties dispute whether Hodgson knew at the time that Gagnon was the staff member responsible. Supp. SMF ¶ 20; Opp. SMF ¶ 20. That same day, Hodgson reported the incident to Smith. Supp. SMF ¶ 21.

Smith left for vacation on April 30, 2014 and did not return until May 5, 2014. Supp. SMF ¶ 22. There is dispute as to whether Hodgson knew that the medication mistake was made by Gagnon on April 30 or May 1, 2014. There is further dispute concerning whether Smith was in touch with Hodgson during his

2

vacation, on May 1, 2014 and whether Hodgson and Smith discussed a plan to remove Gagnon from medication passing duties. Supp. SMF ¶¶ 23 – 27, Opp. SMF ¶¶ 23 – 27. The parties also dispute whether removing Gagnon from medication passing duties was a temporary determination made by Hodgson and another supervisor, Nicole Matson, pending Smith's return, and whether Gagnon's removal from medication passing was meant to be for a set period of time. *Id.*

Smith returned to work on May 5, 2014. Supp. SMF ¶ 28. Woodlands contends that Smith performed an investigation of the incident at that time. Supp. SMF ¶ 28. Gagnon contends that Smith was already aware of the incident and had agreed to the disciplinary action of removing Gagnon from medication passing duties for two weeks. Opp. SMF ¶ 28. Through the investigation, Smith confirmed Gagnon's mistake in administration of medication, found that the employee on the second shift made the same mistake on April 30, 2014, but that the employee who worked the first shift on April 30, 2014 did not make the same mistake. Supp. SMF ¶ 30. Woodlands contends that, after Smith's investigation, Smith reviewed Gagnon's personnel records and decided to terminate her employment based upon the warning issued nineteen days prior and the medication incident on April 29, 2014. Supp. SMF ¶ 31. Gagnon alleges that the medication administration errors were offered merely as a pretext for the termination of Gagnon's employment. Opp. SMF ¶ 31. The other employee who made the same medication administration mistake was issued a warning. Supp. SMF ¶ 32. Woodlands alleges that the differing treatment was based upon the fact that the other employee had not previously been issued a warning where Gagnon had been. Supp. SMF ¶ 32. Gagnon contends that the differing treatment

3

is evidence that Gagnon was fired for making reports of illegal and unsafe conditions rather than for the improper administration of medication. Opp. SMF ¶ 32.

Smith prepared a notice terminating Gagnon's employment on May 5, 2015. Supp. SMF ¶ 33. Smith provided Gagnon with the notice when she arrived for work that day. Supp. SMF ¶ 34. The parties agree that Smith was the sole decision maker with respect to the termination of Gagnon's employment. Supp. SMF ¶ 35.

B. Reports

Woodlands care policy requires employees to document issues with resident care and deviations from the standard of care and to discuss these issues with other employees during that shift. Resp. to Add. SMF ¶ 34. Further, Woodlands requires employees to report issues with resident care and deviations from the standard of care to the employee's supervisor, the Adult Protective Services ("APS"), DHHS Licensing and the DHHS Ombudsman. Add. SMF ¶ 22. Gagnon asserts that she witnessed situations where residents were neglected and not provided with the level of care to which they were entitled, thereby endangering their health and safety. Add. SMF ¶¶ 36 – 38.

Gagnon reported issues regarding residents orally and in notes written in the shift reports. Add. SMF ¶ 42. Hodgson told Gagnon to write her concerns in shift reports so that everybody would be aware of them. Add. SMF ¶ 44. Gagnon's reports are as follows.

A few months prior to the termination of Gagnon's employment, Gagnon made an oral report to Hodgson concerning a resident with penis cancer that she found soaked in urine or covered in feces. Add. SMF ¶ 49. Gagnon asserts that it

4

was the role of the personal care assistants ("PCA"'s) to keep the resident dry and clean. Add. SMF ¶ 49. Woodlands agrees that Gagnon made such a report to Hodgson, and further asserts that many CRMA's and PCA's had documented the care of this resident and that Woodlands was aware of this particular resident's care issues. Resp. to Add. SMF ¶ 49. Hodgson recalls only that Gagnon had reported to her that the resident was incontinent when Gagnon went to do a dressing change. Add. SMF ¶ 54. Smith is not aware of a report to APS regarding any such incident. Add. SMF ¶ 53.

Contractors were hired to bring the Woodlands facility into compliance with accessible bathrooms. Add. SMF ¶ 56. Residents were not moved during the approximately one to one and a half days that it took to do the work. Add. SMF ¶ 56. Residents' families were informed of the construction. Resp. to Add. SMF ¶ 56. A family member of a resident complained to Gagnon that the contractor was getting dust and grease on the resident's belongings. Add. SMF ¶ 58. Gagnon brought the complaint to the attention of Smith. Add. SMF ¶ 58. Smith acknowledges that Gagnon brought this complaint to his attention. Resp. to Add. SMF ¶ 59.

On April 15, 2014, Gagnon noticed and documented that a resident had "severe redness" on her right side. Add. SMF ¶ 60. Gagnon describes the affected area as looking like it had a third degree burn. Add. SMF ¶ 60. Gagnon was the CRMA for this resident for her entire stay. Add. SMF ¶ 61. Gagnon alleges that this was the first time that she had seen the resident's skin in this condition. Add. SMF ¶¶ 61, 63. Woodlands asserts that the resident's skin condition was well documented in the residents care notes as early as March 2013. Resp. to Add. SMF ¶ 61. Gagnon applied cream to the resident's rash. Add. SMF ¶ 62. Gagnon

5

reported the rash to Drost and mentioned the rash again during shift change when Smith was present. Add. SMF ¶¶ 64, 65. Smith told Drost to check the resident. Add. SMF ¶ 65. Drost was unable to check the resident during her shift. Resp. to Add. SMF ¶ 66. The next day, Gagnon checked the resident and alleges that not only was the rash worse but there were untreated sores on the resident's left side. Add. SMF ¶ 67. Gagnon alleges that she reported the rash and sores to LPN Simpson and Hodgson. Add. SMF ¶ 67. Woodlands denies any allegations that sores were reported. Resp. to Add. SMF ¶ 67. No report of the sores was made to APS. Add. SMF ¶ 72.

Gagnon reported to Drost that a staff member gave an insulin injection to a resident in the dining room. Add. SMF ¶ 76; Resp. to Add. SMF ¶ 76. The Woodlands staff is trained not to give medications in public where others can see in order to safeguard the privacy of the resident. Add. SMF ¶ 75. The parties dispute whether there was one report or multiple reports and whether the report(s) was/were made in April or May of 2014. Add. SMF ¶ 76; Resp. to Add. SMF ¶ 76. Gagnon asserts that she made a report of an incident the week of April 27, 2014, and then again on May 4, 2014, after observing that insulin was still being administered in the dining room. Add. SMF ¶¶ 76, 78. Woodlands asserts that the one and only report regarding insulin being administered in the dining room was on May 4, 2014, to Drost. Resp. to SMF ¶ 78. Drost informed the staff member who had given the insulin in the dining room that it was not appropriate. Add. SMF ¶ 81.

Gagnon alleges that she made reports about residents not being fed on multiple occasions. Add. SMF ¶ 84. On May 4, 2014, the same day as she witnessed a resident receive an insulin shot in the dining room, Gagnon alleges

6

that she witnessed a different resident not being fed dinner. Add. SMF ¶ 85. Gagnon alleges that the resident had a norovirus and was unable to attend dinner and that when the resident was well enough to eat she was not given any food and there was no food available for her. Add. SMF ¶ 86. Gagnon contends that she reported this incident to Drost. Add. SMF ¶ 88. Woodlands denies that any report was made and further notes that Gagnon did not include any such complaint in the report. Resp. to Add. AMF ¶¶ 86, 88.

Gagnon alleges that on May 4, 2014, she was talking with Drost about the administration of insulin in the dining room and the unfed resident, and Gagnon told Drost that she intended to report these incidents to DHHS. Add. SMF ¶ 90. Drost does not recall any statement by Gagnon of an intention to make a report to DHHS. Resp. to Add. SMF ¶ 90. Gagnon made a report to DHHS via email on May 15, 2014. Add. SMF ¶ 93. This follows a report made by Gagnon in September 2014. Resp. to Add. SMF ¶ 93.

II.    Summary Judgment Standard

Summary judgment is appropriate if, based on the parties' statements of material fact and the cited record, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821. "A material fact is one that can affect the outcome of the case. A genuine issue of material fact exists when the fact finder must choose between competing versions of the truth." *Id.* (citations omitted). When deciding a motion for summary judgment, the court reviews the evidence in the light most favorable to the non-moving party. *Id.*

When the party moving for summary judgment bears the burden on a claim or defense, the moving party must establish the existence of each element

7

of the claim or defense without dispute as to any material fact in the record in order to obtain summary judgment. *Cach, LLC v. Kulas*, 2011 ME 70, ¶ 8, 21 A.3d 1015. If the motion for summary judgment is properly supported, then the burden shifts to the non-moving party to respond with specific facts indicating a genuine issue for trial in order to avoid summary judgment. M.R. Civ. P. 56(e).

III.    Discussion

In order to make out a claim pursuant to the Maine Whistleblower Protection Act, a plaintiff must allege facts sufficient to show the "three elements to a claim of unlawful retaliation: (1) the employee engaged in activity protected by the statute; (2) the employee was the subject of an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action." *Costain v. Sunbury Primary Care, P.A.*, 2008 ME 142, ¶ 6, 954 A.2d 1051. Woodlands moves the Court for summary judgment on two grounds. Woodlands argues that Gagnon has failed to allege facts sufficient to show that any reports made by Gagnon were protected by the Maine Whistleblower Protection Act ("MWPA") and that no causal connection exists between Gagnon's alleged reports and the termination of her employment. The Court considers each of these arguments in turn.

A. Reports

Woodlands first argues that Gagnon's reports were not protected under the Maine Whistleblower Protection Act ("MWPA"). The MWPA provides:

> 1. **Discrimination prohibited.** No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because:
> ...
> B. The employee, acting in good faith, or a person acting on behalf of the employee, reports to the employer or a public body, orally or

8

in writing, what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual.

26 M.R.S. § 833 (2015). The following subsection creates an exception to the rule that an employer may not discriminate against an employee for reporting a threat to health or safety:

2. Initial report to employer required; exception. Subsection 1 does not apply to an employee who has reported or caused to be reported a violation, or unsafe condition or practice to a public body, unless the employee has first brought the alleged violation, condition or practice to the attention of a person having supervisory authority with the employer and has allowed the employer a reasonable opportunity to correct that violation, condition or practice.

Prior notice to an employer is not required if the employee has specific reason to believe that reports to the employer will not result in promptly correcting the violation, condition or practice.

26 M.R.S. § 833(2) (2015).

### 1. Supervisory Authority

Woodlands argues that Nurse Drost, the individual to whom Gagnon alleges that she reported threats to residents' health and safety, was not a person with supervisory authority.[1] Therefore, Woodlands argues, any reports made by Gagnon to Drost did not comply with the requirements of the statute and are not protected.

Gagnon argues that Woodlands has conflated the two separate subsections of Section 833. Gagnon interprets subsection one as setting out a protected activity as a report made by an employee to his or her

---

[1] Gagnon specifically alleges that she reported in the instances of a resident's rash, the insulin administration in the dining room, and the residents who were not fed to Drost.

9

employer or to a public body concerning health or safety. Gagnon cites to the statutory definition of employer as:

> **2. Employer.** "Employer" means a person who has one or more employees. "Employer" includes an agent of an employer and the State, or a political subdivision of the State.

26 M.R.S. § 832. Gagnon argues that Nurse Drost did have supervisory authority, but even if the Court finds the Drost did not have supervisory authority, Drost is an agent of Woodlands. By reporting to Woodlands' agent, Gagnon argues that she fulfilled the requirements of the statute and her report was a protected activity pursuant to the MWPA. Gagnon further contends that Section 833(2), laying out the exception, does not affect this claim. Section 833(2) states that a report to a public body is only a protected activity if the employee has first made the same report to a "person having supervisory authority with the employer and ... allowed the employer a reasonable opportunity to correct that violation." 26 M.R.S. § 833(2) (2015). Gagnon argues that her reports were mostly made to Woodlands via Drost, not to a public body. For those reports made by Gagnon directly to a public body, she argues that she first made the report to Drost and provided a reasonable opportunity for Woodlands to correct conditions prior to contacting DHHS.

The Court agrees with the reasoning set forth by Gagnon. Where a report is made to an employer, the report must be made to the employer or an agent thereof in order to be a protected activity. *See* 26 M.R.S. §§ 833(1), 832. Where a report is made to a public body, the employee must have first made the same report to a person with supervisory authority with the employer and provided a reasonable amount of time for the employer to remedy the conditions in order for the report to be a protected activity. *See* 26 M.R.S. § 833(2); *See also Hickson v.*

10

*Vescom Corp.*, 2014 ME 27, ¶ 21, 87 A.3d 704; *Costain v. Sunbury Primary Care, P.A.*, 2008 ME 142, ¶ 7, 954 A.2d 1051.

At summary judgment, the Court views the facts in the light most favorable to the plaintiff. Gagnon has alleged facts, which if true, are sufficient to fulfill the requirements of a protected activity. She alleges that she made numerous reports to Drost, and after waiting a reasonable amount of time, she reported the unchanged conditions to a public body. Whether Gagnon did make the alleged reports, and whether Nurse Drost is a person with supervisory authority with Woodlands are questions of fact. These questions are inappropriate for summary judgment.

### 2. Job Duties

Woodlands also contends that the alleged reports do not constitute protected activities pursuant to the MWPA because part of Gagnon's job at Woodlands was to make such reports. Woodlands points to a handful of cases for the proposition that "a plaintiff's reports are not whistleblowing if it is part of his or her job responsibilities to make such reports, particularly when instructed to do so by a superior." *Winsow v. Aroostook County*, 736 F.3d 23, 32 (1st Cir. 2013); *See Harrison v. Granite Bay Care, Inc.*, 811 F.3d 36, 51 (1st Cir. 2016); *Sklare v. Extendicare Health Services, Inc.*, 515 F.3d 836, 841 (8th Cir. 2008). Woodlands claims that the alleged reports were nothing more than Gagnon fulfilling an important job duty, that she was told to do so by her supervisor, and that making reports did not jeopardize her job.

Gagnon argues that Woodlands has misrepresented the cited cases and that there is no exception for job duties. Instead of creating a job duties exception to protected activity, Gagnon argues that the caselaw supports a review of the

11

motivation behind the report. Gagnon cites to *Harrison v. Granite Bay Care, Inc.* in support of this explanation. *Harrison v. Granite Bay Care, Inc.*, 811 F.3d 36 (1st Cir. 2016). In *Harrison*, discussing the rule developed in *Winslow v. Aroostook County*, the First Circuit stated that "we never so much as uttered the phrase 'job duties exception' in *Winslow*, and Granite Bay's arguments in particular are based on a distorted understanding of that case." *Id.* at 47. After further discussion concerning the facts and findings of *Winslow*, the First Circuit held "[i]n sum, the lack of evidence in the record showing that *Winslow* was motivated by whistleblowing concerns, and not some broad-based job duties exception, is why we concluded no reasonable jury could find that she had engaged in protected whistleblowing activity." *Id.* at 49.

As held by the First Circuit in *Harrison*, the Court looks to Gagnon's motivation in making the report. Whether reporting was one of Gagnon's job duties may be considered in discerning Gagnon's motivations in making the reports. However, simply establishing that her job required her to report is not sufficient to entitle Woodlands to a legal determination that her reports were not protected activities. As described in *Harrison*, "if an employee is just doing his or her job by passing information to others in the organization, he or she may not have intended to engage in protected whistleblowing activity by bringing to light an unlawful (or potentially unlawful) activity or occurrence." *Id.* at 52.

Gagnon has alleged that her motivation for making the report was concern for the health and safety of Woodlands residents. The Court finds that whether Gagnon was motivated by a good faith belief that the health and safety of the residents was at risk is a question of fact. The Court finds that questions of

12

fact remain and Woodlands is not entitled to judgment as a matter of law on the issue of whether Plaintiff engaged in protected activities.

### B. Causal Connection

Woodlands next argues that Gagnon has not alleged facts showing that there was a causal connection between her protected activity and the termination of her employment. Woodlands argues that because Nurse Drost does not remember any report made by Gagnon, with the exception of the report concerning insulin being administered in the dining room, and did not pass any concerns voiced by Gagnon on to Woodlands' management, that it is not possible that the reports caused Gagnon's employment to be terminated. Stated another way, Woodlands contends that because Smith was never told about any reports made by Gagnon, the reports could not have been the reason he fired Gagnon.

The Law Court has held that, for the purposes of summary judgment, causation can be inferred from the amount of between when an employee engages in a protected activity and when that employee is fired. "Temporal proximity of an employer's awareness of protected activity and the alleged retaliatory action may serve as the causal link for purposes of a prima facie case." *Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, ¶ 21, 45 A.3d 722. In this case, Gagnon alleges that her last report to Drost was on May 4, 2014 and that she followed that up with a report to DHHS on May 15, 2014. Gagnon was fired on May 5, 2014. Because Gagnon's employment was terminated the day after an alleged report was made, the Court finds sufficient temporal proximity between the report and the termination to suggest causation. Questions of fact remain concerning whether Gagnon made the alleged reports and whether Smith

13

knew of any reports at the time of the termination. Summary judgment is inappropriate on the element of causation.

IV. Conclusion

The Court denies Woodlands' Motion for Summary Judgment.

The Clerk is directed to incorporate this Order into the docket by reference in accordance with M.R. Civ. P. 79(a).

DATE:  9/23/16

Michaela Murphy
Justice, Business and Consumer Docket

14