# United States Court of Appeals
## For the First Circuit

No. 13-1319

DENA WINSLOW,

Plaintiff, Appellant,

v.

AROOSTOOK COUNTY,

Defendant,

NORTHERN MAINE DEVELOPMENT COMMISSION, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Thompson, Circuit Judges.

Arthur J. Greif, with whom Julie D. Farr and Gilbert & Greif, P.A. were on brief, for appellant.
Philip J. Moss, with whom Melinda J. Caterine and Fisher & Phillips LLP were on brief, for appellee Northern Maine Development Commission, Inc.
Peter T. Marchesi, Cassandra S. Shaffer, and Wheeler & Arey, P.A., on brief for appellee Aroostook County.

November 15, 2013

**LYNCH, <u>Chief Judge</u>**.  Dena Winslow appeals from the district court's grant of summary judgment in favor of the Northern Maine Development Commission, Inc. ("NMDC") on her claim that NMDC's failure to hire her when it became the fiscal agent for the Workforce Investment Act grant constituted whistleblower retaliation under the Maine Whistleblowers' Protection Act ("MWPA"), Me. Rev. Stat. tit. 26, § 831 <u>et seq.</u>  We agree with the district court that, on the undisputed facts, Winslow is not a whistleblower under the MWPA and so affirm.

## I.

Because this case comes before us on appeal from summary judgment, we recite the facts in the light most favorable to Winslow.  <u>See</u> <u>Valley Forge Ins. Co.</u> v. <u>Field</u>, 670 F.3d 93, 96-97 (1st Cir. 2012).

### A.    <u>Background</u>

This case stems from a report done by a federal agency reviewing a local area federal grant sub-recipient in Maine for compliance with program requirements.  Under the Workforce Investment Act of 1998 ("WIA"), 29 U.S.C. § 2801 <u>et seq.</u>, Maine has obtained federal funding to strengthen local workforces and career opportunities.  As a condition of eligibility, Maine was required to establish a state workforce investment board.  The governor then designated local workforce investment areas in which WIA activities are administered.  29 U.S.C. § 2831(a)(1)(A).

Aroostook County is in Local Area I, the largest workforce investment area in the state, and is under the authority of the Local Area I Workforce Investment Board ("LWIB"). From 1999 until early 2010, Aroostook County was the grant sub-recipient for the LWIB. In that capacity, the County acted as the fiscal agent for the grant and oversaw the administrative and financial operations of the relevant WIA programs.

In March of 2008, Winslow was hired as the Executive Director of the LWIB. Consistent with the job description in place at the time, Winslow reported to and was supervised by Doug Beaulieu, the Aroostook County Administrator. She received her salary and benefits from Aroostook County, and the County used WIA funds for this purpose. But apparently there was no explicit fiscal agent agreement between the LWIB and the County and this raised concerns. Winslow claims to have been a whistleblower as to those concerns.

B.      Federal Monitoring Visit

In November 2009, federal monitors from the Department of Labor undertook a compliance review of the WIA grants in Maine, including of the LWIB. The monitors found that Winslow's job description was not in compliance with federal program requirements[1] because, absent an express agreement between the LWIB

_____

[1] Following the visit, the Department of Labor ultimately issued a report to the Maine Department of Labor outlining its findings. The report was issued on April 13, 2010, slightly over

-3-

and Aroostook County, it was improper for Winslow to report to the County rather than to the LWIB.  On November 19, the federal monitors conducted a preliminary exit interview at the office where Beaulieu and Winslow worked, which Winslow attended.  After the exit interview, federal monitor Tim Theberge went to Beaulieu and told him of the monitors' findings.  Beaulieu then spoke to Winslow and instructed her to type up her notes from the exit interview meeting and email them to him.  These exit interview notes included a section on findings, which stated, as item number five: "My job description indicates I am supervised by the County Administrator, however, I work for the Board, who supervise me.  This is reflected in 117D3Bii."[2]  The exit interview notes included a separate section on "Areas of Concern."  They also stated that the federal monitors would meet with the State during the week of January 6-7, and that the state would then draft a formal response, after which there would be a formal federal response.  As to the local report, officials would be given until January 30 to resolve these findings.

_____

a month before Winslow initiated this suit.

   [2] Apparently the exit interview notes' reference to "117D3Bii" is a reference to section 117(d)(3)(B)(ii) of the Workforce Investment Act of 1998.  That section reads: "The functions of the local board shall include the following: . . . (ii) Staff. The local board may employ staff."  Workforce Investment Act of 1998, Pub. L. No. 105-220, 112 Stat. 936, 957-58 (codified at 29 U.S.C. § 2832).

Then, also at Beaulieu's direction, Winslow sent the exit interview notes to Barry McCrum, the LWIB Chairman, along with Christopher Gardner and Norman Fournier, the two co-Chief Local Elected Officials ("CLEOs") of the LWIB. The CLEOs (and not the full LWIB Board) are responsible for designating a WIA fiscal agent. See 29 U.S.C. § 2832(d)(3)(B)(i)(II). Those exit interview notes reporting on the federal monitors' findings, circulated at Beaulieu's request, form the initial basis for Winslow's assertion that she is a whistleblower. Defendant NMDC is a separate entity, not involved in the noncompliance findings regarding Aroostook County.

At a December 2 public Aroostook County Commissioners' meeting, Beaulieu informed the commissioners of the report from the federal monitoring visit. The minutes of the meeting reported that "one of the findings [of the compliance review] is that the Executive Director should, under the law, report to the [LWIB] Board," "not the County Administrator." After the minutes were adopted at a later County Commissioners' meeting on December 16, they were posted online in full for public review.

During this period, Beaulieu was in discussions with the two CLEOs and the Chairman of the LWIB about preparing an agreement making a different entity the new fiscal agent for the LWIB. The proposal was that defendant NMDC be the fiscal agent. For this purpose, around December 15, Beaulieu met with Robert Clark, the

-5-

Executive Director of NMDC and also a member of the LWIB Board, to discuss the transition. In preparation for that meeting, Clark completed a draft transition plan, which included as part of the process "Notification of staff termination -- December 31." On December 28, Beaulieu forwarded to Clark the then-current draft of the letter that he had previously sent to the CLEOs for them to send to the Maine Department of Labor. In that email to Clark, Beaulieu stated: "Note how I dealt with the staffing issue. It leaves it up to you." The two CLEOs of the LWIB did not object to the staff termination proposal.

On the broader topic of the transition to a new fiscal agent, Beaulieu was also in communication with the CLEOs, including in a series of December 29 emails. Beaulieu indicated that federal law required there be an agreement between the LWIB and NMDC, enclosed a draft, and stressed: "<u>this agreement is mandated; it is not optional. I just want to make sure we are in compliance</u>, so we don't jeopardize [losing] our local program." (emphasis added). Winslow played no role in these discussions.

In these December 29 emails, Beaulieu and the CLEOs agreed that the LWIB Board needed to be kept informed of the proposed fiscal agent agreement. Beaulieu suggested that "a notice to the full Board by the CLEOs and the Board Chair would be the most appropriate route." On the topic of how to communicate the

information to the full LWIB Board, Beaulieu explained the position he was in:

> It is generally not my function or prerogative to communicate directly with the Board. That is a function of the Board Director [Winslow]. As a practical matter, one of the findings of the Feds, which said that the Board Director should not report to the County Administrator, has made my ability to supervise the concerned individual difficult, if not impossible, to manage. So, as it relates to the Board Director, I can happily suggest actions, but I am unable to ensure compliance with the same.

While Beaulieu was dealing with the LWIB Board leadership to effectuate a solution to the federal findings, Winslow took steps on her own. On December 30, Winslow visited Clark's office unannounced to drop off a CD of WIA financial policies. While there, Winslow held out her hands, looked up at the ceiling, and said "So, where are you going to put me?" Clark responded that they were looking at doing "something different."

Following this encounter, Winslow believed that it was her responsibility as Executive Director to inform all LWIB members of her view of the events. To that end, without obtaining permission from Beaulieu, the LWIB Chairman, or the two CLEOs, on December 31, she sent all of the LWIB members and "interested parties" (including Beaulieu) an email she authored entitled "Opportunity." While it acknowledged that it was the CLEOs who had authority as to designating the fiscal agent, it nonetheless informed the other board members about their responsibilities as to

the fiscal agent.  The email also mentioned the proposal that the NMDC become the fiscal agent.  It then outlined the "large amount of work" ahead, assuming that she would be the person working with the board.

The "Opportunity" email then addressed her proposal that the LWIB newly schedule an interim meeting, stating:

> If you are interested in holding an interim board meeting prior to our next regularly scheduled meeting on February 11, please reply to all on this memo to request it.  According to our Board by-laws, if five Board members request an interim meeting one will be scheduled.

This "Opportunity" email provoked responses.

After receiving Winslow's email, Beaulieu emailed Chris Gardner, a CLEO, and said:  "This is insubordination.  [LWIB Chair] Barry McCrum is upset."  It was the Chair's responsibility to schedule meetings, and the next meeting had already been scheduled.  And in a later email exchange with McCrum, Clark wrote about the "Opportunity" email:  "If I was her boss she would be fired immediately for insubordination."

Beaulieu scheduled a meeting with Winslow on January 4 to reprimand her for sending the "Opportunity" email.  At about nine that morning, in advance of the meeting, Beaulieu emailed McCrum, the LWIB Chairman, and the LWIB CLEOs the reprimand memo that he planned to give Winslow at the meeting.  He did not send it to Clark.  That memo objected to the "Opportunity" email in that it

-8-

"essentially solicited interest in an interim board meeting . . . without the knowledge or approval of our Board Chair, Barry McCrum." It termed the email "unprofessional, inappropriate and in direct contradiction to proper protocol" and stated that Winslow had "created an embarrassing situation for the Board, the County of Aroostook and the business sector in both counties, in particular."

At 11:30 that same morning, after he met with Winslow, Beaulieu emailed McCrum and the CLEOs, stating that he had a "long, productive meeting" with Winslow, and that he had "decided to rescind" his earlier memo to her. Winslow was copied on this email.

The next day, on January 5, Winslow sent to Beaulieu, McCrum, and the CLEOs, and addressed to the Aroostook County Commissioners a response that outlined her objections to Beaulieu's memo, now rescinded. In relevant part, Winslow's memo read:

> The memo you were copied on yesterday from Doug is an outrageous attempt to slander me. There is nothing embarrassing to the County of Aroostook, nor to any of you, because I performed my job duties and responded to requests for information from Board members. The information I provided (as requested), was what Federal Law says, and what the Board of Director's By-laws say. There is nothing there that should have been an embarrassment, and certainly nothing that is a secret.

McCrum forwarded Winslow's letter to Clark later that day.

On January 6, Chairman McCrum forwarded Beaulieu's original reprimand email to Clark, to give Clark some context for

Winslow's January 5 memo. In reference to Beaulieu's memo, Clark responded: "Well, that's all true!!" McCrum then responded: "Hard to argue with the truth."

C.      Transition to NMDC

On January 14, 2010, the two CLEOs of the LWIB signed an agreement designating NMDC as the fiscal agent effective February 15; the agreement included a subagreement that NMDC would "[s]erve as staff to the Local Area 1 Workforce Investment Board (LWIB) and perform duties assigned by the CLEOs and [the] LWIB." This was intended to remedy the compliance issues found by the federal monitors,[3] and the CLEOs informed the Commissioner of the Maine Department of Labor of the impending transition the next day, January 15. In signing this agreement for the LWIB, the LWIB CLEOs knew that NMDC would provide staffing for the LWIB and had planned to advertise and seek applications for a new Director of Workforce Development, whose job would encompass the functions of the LWIB Executive Director.

On January 15, a day after the agreement between NMDC and the LWIB was signed and two weeks after Winslow had sent the "Opportunity" email, the LWIB held a board meeting, during which Winslow served as secretary and, in her capacity as Executive

---

[3] After working with both the federal monitors and Maine Department of Labor officials to ensure that the new organizational structure was in compliance with the WIA, NMDC entered into a final management and services agreement with the CLEOs on April 15, 2010.

Director, gave a presentation on the federal monitoring visit and passed out copies of the WIA. At Beaulieu's request, at this meeting Winslow provided all of the LWIB Board members with copies of the exit interview notes. (Some members had received them earlier.) As to what Winslow said during her presentation, Clark interrupted her at several points to loudly voice disagreement with what she was saying, and called her "disgusting" during the meeting. Clark stated that he had read the entire WIA law and that Winslow had not presented some of the relevant parts.

On January 25, Winslow was formally informed that NMDC intended to advertise for a new Executive Director after it became the fiscal agent for the LWIB. At least by this point, if not before, Winslow knew that the new fiscal agent would not necessarily employ her. As said, she met with Clark unannounced on December 30 and received no assurance she would be rehired. She sent her "Opportunity" email on December 31.

In January, NMDC posted a job listing for a position it termed Director of Workforce Development; in addition to several other responsibilities, this Director would also serve as the Executive Director of the LWIB. While the Director of Workforce Development position had the responsibilities of the LWIB Executive Director, the two positions were not identical. In addition to LWIB Executive Director responsibilities, the Director of Workforce development would "provide professional management and

-11-

administrative services at the board level in directing fiscal planning, budgeting, contract development, and assessment of Workforce Investment Act (WIA) programs in Local Area 1." The listing stated that "[i]nterested applicants should possess a Masters Degree in public administration, or related field, or a combination of a Bachelors Degree and related experience in economic development, workforce development, and public administration." The application deadline was February 10.

On February 4, Beaulieu, on behalf of Aroostook, informed Winslow via email that:

> Because the County of Aroostook will no longer be involved with the administration of this program, at the February 3, 2010 County Commissioners' Meeting, the Aroostook Board of County Commissioners approved the termination of your employment as Executive Director of Workforce Investment Act Program for Local Area 1 effective February 12, 2010.

NMDC's assumption of responsibilities as the fiscal agent was to become effective on February 15. Winslow applied for NMDC's Director of Workforce Development position. She was interviewed, although she did not have a Master's Degree in this field.

On February 17, Clark and Ruby Bradbury of NMDC interviewed Winslow and three other applicants for the new job: Patricia Boucher (the LWIB's Executive Director for five years before Winslow's tenure), Arthur Faucher, and Ryan Pelletier. Interview notes indicate that "have to" was written next to Faucher's and Winslow's names, and "interview but no" was written

-12-

next to Boucher's name.  Ultimately, NMDC hired Pelletier, who was also an NMDC board member.  NMDC's stated reasons for hiring Pelletier were that he (1) had a Master's Degree in Public Administration; (2) had eleven years of management experience in local government; (3) served in other positions on various state and local boards and committees; (4) had business contacts in the area; and (5) possessed an  understanding of the WIA mission.

Winslow was notified by a letter dated February 22, 2010 that she did not get the job.  She filed this MWPA action on May 26, 2010, originally suing both Aroostook County and NMDC for violating the whistleblower law.  The district court granted NMDC's motion for summary judgment on February 15, 2013.[4]  Winslow timely appealed; she has apparently resolved her dispute with Aroostook and only her whistleblower claims against NMDC remain.

II.

A.        Standard of Review

We review a district court's grant of summary judgment de novo.  Fontánez-Núñez v. Janssen Ortho LLC, 447 F.3d 50, 54 (1st Cir. 2006).  We have carefully viewed the entire record "in the light most hospitable to the party opposing summary judgment,

---

[4] In the district court, Winslow also brought a claim that NMDC refused to employ her because of her physical disabilities in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.  The district court granted summary judgment in favor of NMDC on that claim, and Winslow does not appeal that portion of the district court's decision.

indulging all reasonable inferences in that party's favor." <u>Suarez</u> v. <u>Pueblo Int'l, Inc.</u>, 229 F.3d 49, 53 (1st Cir. 2000) (quoting <u>Griggs-Ryan</u> v. <u>Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990)) (internal quotation mark omitted).

B.        <u>Maine Whistleblowers' Protection Act</u>

As we understand it, Winslow's state whistleblower claim against NMDC is that, but for her "whistleblowing" about the violation of federal law inherent in Aroostook County being her employer absent a separate fiscal agent agreement, NMDC (a separate entity) would have hired her in its position of "Director of Workforce Development."

The MWPA states, in relevant part:

> No employer may discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because . . . [t]he employee, acting in good faith, . . . reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of . . . the United States.

Me. Rev. Stat. tit. 26, § 833(1)(A). The Supreme Judicial Court of Maine has held that this subsection, when read alongside the rest of section 833, "unambiguously limit[s] the protection afforded by the [M]WPA to (1) employees (2) who report to an employer[5] (3)

---

[5] There is no individual supervisor liability under the MWPA. <u>See</u> <u>Fuhrmann</u> v. <u>Staples Office Superstore E., Inc.</u>, 58 A.3d 1083, 1098 (Me. 2012).

about a violation (4) committed or practiced by that employer." Costain v. Sunbury Primary Care, P.A., 954 A.2d 1051, 1054 (Me. 2008).[6]

The MWPA embodies Maine's larger "statutory public policy against discharge in retaliation for reporting illegal acts, a right to the discharged employee, and a remedial scheme to vindicate that right." Fuhrmann v. Staples Office Superstore E., Inc., 58 A.3d 1083, 1097 (Me. 2012) (quoting Bard v. Bath Iron Works Corp., 590 A.2d 152, 156 (Me. 1991))(internal quotation mark omitted).

To prevail on a claim of whistleblower discrimination under the MWPA, a plaintiff must show that she "engaged in activity protected by the [M]WPA, she experienced an adverse employment action, and a causal connection exists between the protected activity and the adverse action." Fuhrmann, 58 A.3d at 1090. Part of the plaintiff's burden of demonstrating that her activity was protected is to show that the plaintiff and defendant have a relationship that falls within the ambit of the MWPA.

The parties have not focused on whether NMDC, as opposed to Aroostook County, was ever Winslow's "employer," or whether her

---

[6] The MWPA does not provide whistleblowers with a direct cause of action. The Maine Human Rights Act (MHRA) provides a right of action to individuals "who have been subject to unlawful discrimination, including whistleblowers who have suffered retaliatory discharge or other adverse employment actions." Costain, 954 A.2d at 1053 (citing Me. Rev. Stat. tit. 5, § 4572(1)(A)).

complaints were about violations which were committed or practiced by NMDC. At oral argument, Winslow contended that NMDC had an obligation to hire her when it took over as the fiscal agent. There is no evidence in the record to support her contention that NMDC had any such obligation. And given the Department of Labor's ultimate approval of the NMDC agreement, including the job description for the Director of Workforce Development, there can be no claim that NMDC violated federal law in its decision to hire a new person for the new position.

By its terms, the MWPA only prohibits certain actions taken by an "employer." Me. Rev. Stat. tit. 26, § 833(1); see Costain, 954 A.2d at 1054 (requiring that in order to be protected by the MWPA, a whistleblower's report must be made to an employer about a violation that was committed by that employer). The assumption of fiscal agent responsibilities by NMDC required a new contract between the LWIB and NMDC which became effective on February 15, 2010, after Winslow was terminated by Aroostook County. We express doubt that NMDC ever was Winslow's employer within the meaning of the MWPA.

In the absence of any articulation by Winslow, we assume, as the district court did, that Winslow's claim against NMDC is instead based on a failure to hire an applicant theory. That claim would arise under § 4572(1)(A) of the Maine Human Rights Act (MHRA), which prohibits employers from "fail[ing] . . . to hire" an

"applicant for employment . . . because of previous actions taken by the applicant that are protected" under the MWPA.  Me. Rev. Stat. tit. 5, § 4572(1)(A).

We affirm the district court's finding Winslow did not engage in whistleblower conduct and so has no claim against NMDC under either section.

We start with the assumption, in Winslow's favor, that the federal monitor's conclusion that Aroostook could not be Winslow's employer unless it had a separate fiscal agent agreement was a "violation of a law or rule" within the meaning of the MWPA, committed by her employer (Aroostook County).  Nonetheless, the combination of several factors from the undisputed facts require the conclusion that she was not a whistleblower under Maine law.

It was the federal monitors who uncovered the "violation" of the regulations, and not Winslow.  They also eventually published a formal report of their findings.  It was the monitors who initially reported the findings to Beaulieu;[7] Winslow did not

_____

[7] In Winslow's brief, she asserts that she was the one who urged Theberge to disclose the findings of the monitoring visit to Beaulieu.  The district court explicitly refused to consider this assertion, as it had previously granted NMDC's motion to strike on the grounds that the statement was contrary to Winslow's previous deposition testimony.  Winslow argues this exclusion was error; NMDC disputes Winslow's continued reliance on this assertion, arguing that the district court did not abuse its discretion in declining to consider the statement.  See Poulis-Minott v. Smith, 388 F.3d 354, 357 (1st Cir. 2004) ("We will reverse the district court's evidentiary rulings only where there is an abuse of discretion."); see also Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806-07 (1999) (holding that a "party cannot create a

-17-

do so.  The federal monitors met promptly with Beaulieu to notify him directly of the "violation" and the need for corrective action, and it was Beaulieu who took action to correct the problem.  Even assuming an MWPA plaintiff need not be the one to find the original violation or even the first to report it to the employer in other circumstances,[8] that does not help Winslow.  Winslow was not even the one who published the results of the monitoring visit.

Further, it was Beaulieu who <u>directed</u> Winslow to distribute the interview notes to LWIB Chairman McCrum and to Gardner and Fournier, the CLEOs of the LWIB.  Only days later, on December 2, the Aroostook County Commissioners discussed the problem in a public session, at Beaulieu's insistence.  Plainly,

---

genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement . . . without explaining the contradiction or attempting to resolve the disparity").  Winslow merely disagrees with the district court's holding at length and presents no reasoned argument that the district court abused its discretion in this instance. We will not disturb the district court's determination.  However, even if we were to accept Winslow's assertion on this point, it would not change our underlying analysis.

[8] To the extent that Winslow relies on <u>Parks</u> v. <u>City of Brewer</u>, 56 F. Supp. 2d 89 (D. Me. 1999), in support of her claim that the MWPA protects reports even where the information in the report is known and reported on by others, that reliance is unavailing.  In <u>Parks</u>, the court denied the defendant's motion for summary judgment on an MWPA claim even where it acknowledged that the plaintiff was the second person to raise the issue of the relevant violation. <u>Id.</u> at 103.  However in that case, the first "report" of the violation was in the form of another employee seeking approval from the defendant Brewer City Council for actions that would have violated a local ordinance; it was not a report of wrongdoing for the purpose of correcting the problem. <u>Id.</u>  The facts here are plainly distinguishable.

-18-

there was no suppression by Beaulieu or Aroostook of the existence of a violation.

From the undisputed facts it is clear Beaulieu and Aroostook County were not trying to bury the problem of the violation reported to Beaulieu by the federal monitors but to acknowledge it and deal with it.  The same is true of the Chairman of the LWIB and the two LWIB CLEOs, who had the authority to choose the next fiscal agent and who were involved in both structuring the agreement with NMDC and obtaining approval of the new organizational structure.

Winslow makes the claim, plainly refuted by the record, that the LWIB would not have known of the violation but for her reporting it to them.  It was Beaulieu who reported the information to the leadership of the LWIB, particularly those who held the responsibility to pick a new fiscal agent, and it was Beaulieu who urged a report to the full Board (although some other members, like Clark, obviously were already aware).

To the extent Winslow communicated information, she did so as part of her job responsibilities, either under direct instructions from Beaulieu, or as to the "Opportunity" email because she thought it was among her responsibilities to do so.

Though there may be exceptions, the usual rule in Maine is that a plaintiff's reports are not whistleblowing if it is part of his or her job responsibilities to make such reports,

particularly when instructed to do so by a superior.  See, e.g., Capalbo v. Kris-way Truck Leasing, Inc., 821 F. Supp. 2d 397, 419 (D. Me. 2011) (granting summary judgment in favor of defendant where plaintiff's MWPA claim was based on reports he made at the direction of his employer).  That is also true elsewhere.  See, e.g., Kidwell v. Sybaritic, Inc., 784 N.W.2d 220, 231 (Minn. 2010) (stating that when a company's in-house counsel advises the company on compliance issues, "the lawyer is not sending a report for the purpose of exposing an illegality and the lawyer is not blowing the whistle"); Willis v. Dep't of Agric., 141 F.3d 1139, 1144 (Fed. Cir. 1998) ("In reporting some of the [] [farms that plaintiff monitored] as being out of compliance, [plaintiff] did no more than carry out his required everyday job responsibilities . . . and [that] cannot itself constitute a protected disclosure under the [federal] WPA.").  Similarly, in the Fair Labor Standards Act context, we have held that an employee who reports violations of laws or other requirements as part of his job is not engaging in protected activity for the purposes of an anti-retaliation provision.  Claudio-Gotay v. Becton Dickinson Caribe, Ltd., 375 F.3d 99, 102-03 (1st Cir. 2004).  We see no reason to depart from that rationale here.

From the time the violation was uncovered by the federal monitors until the final management and services agreement was signed with NMDC, Winslow's superiors--at both the LWIB and

-20-

Aroostook County--were engaged in an effort to bring about compliance with the WIA.  In spite of Winslow's protestations to the contrary, the facts are clear: she was only one of several people who transmitted results of the federal monitoring visit, and she did so largely at Beaulieu's direction.  Winslow did not "actually blow[] the proverbial whistle," <u>Tripp</u> v. <u>Cole</u>, No. Civ. 03-289-PS, 2004 WL 2185840, at *4 (D. Me. Sept. 24, 2004), on any violations of law.

                                III.

        We <u>affirm</u> entry of summary judgment.  Costs are awarded to NMDC.