STATE OF MAINE                                  AUGUSTA SUPERIOR COURT
KENNEBEC, ss.                                   DOCKET NO.: AUGSC-CV-17-134

ROLAND E. PUSHARD, III          )
                                )
        Plaintiff,              )
                                )
    v.                          )       ORDER ON DEFENDANT'S
                                )       MOTION FOR SUMMARY
RIVERVIEW PSYCHIATRIC           )       JUDGMENT
CENTER                          )
                                )
        Defendant.              )

This matter is before the court on the Defendant's Motion for Summary Judgment.

## BACKGROUND

This case involves the alleged retaliation by the Riverview Psychiatric Center ("Riverview" or "Defendant"), against its former employee Roland Pushard ("Pushard" or "Plaintiff"). After Pushard made a variety of complaints to his supervisor at Riverview, it allegedly engaged in an adverse action against Pushard by terminating him. Pushard brought an administrative action before the Maine Human Rights Commission against Riverview. The action was dismissed after the Commission issued Pushard a right to sue letter on May 11, 2017. Subsequently, Pushard filed a Complaint with this court on June 28, 2017, alleging a violation of the Whistleblowers' Protection Act ("WPA"). On February 1, 2018, the Complaint was amended over Riverview's objection to add a second count of unpaid wages. Riverview moved to dismiss Count II, arguing that it was barred by sovereign immunity and that Pushard failed to exhaust his administrative remedies in seeking payment of the wages allegedly due to him. On June 6, 2018, the court agreed with Riverview and dismissed Count II of the Amended Complaint. Riverview now moves for summary judgment on the remaining Count.

1

The following facts are taken from the parties' Statement of Material Facts ("SMF") and are undisputed unless otherwise noted.

Pushard was employed with Riverview as a nurse from October 2006 through October 2015. (Defendant's SMF ("DSMF") ¶¶ 1-2.) Pushard became the Director of Nursing ("DON") around June 2014. (DSMF ¶ 10.) His supervisor was Jay Harper ("Harper"), the Superintendent of Riverview. (DSMF ¶¶ 11-12.) It has been publicly known for years that Riverview has been historically understaffed. (DSMF ¶¶ 14-15.) Riverview was, and still is, under a consent decree with the State regarding its management and staffing. (Plaintiff's Additional SMF ("PASMF") ¶ 136.) Pushard and Harper had discussions about this understaffing and disagreed about whether mental health workers or acuity specialists were more appropriate to hire.[1] (DSMF ¶¶ 17-18.) Harper and Pushard also disputed the appropriate role of nurse educators; Pushard wanted them to be more hands-on and "on the floor" with the patients as opposed to a more administrative setting. (DSMF ¶ 20, PASMF ¶ 142.) Pushard was outspoken about staffing issues. (PASMF ¶ 260.)

Colleen Cutler was the Assistant Director of Nursing ("ADON") during this time and held opinions similar to Pushard's regarding staffing and the role of nurse educators that she expressed to Harper. (DSMF ¶ 24, PASMF ¶ 150.) Around November 2014, during Cutler's time as ADON, Pushard believed that Harper treated her disrespectfully and took her office from her. (DSMF ¶¶ 25-26.) Pushard told Harper that that he thought the way he was treating the ADON was wrong. (DSMF ¶¶ 28-29.) Pushard never specifically said that he thought these actions were illegal, but he did describe them as

---

[1] Mental health workers are usually Certified Nursing Assistants ("CNAs") who can also help out with hands-on patient care. Acuity specialists are not usually CNAs but have more formal education that they use to keep patients from acting out.

2

"retaliatory" to Harper. (DSMF ¶ 30, PASMF ¶ 30.) Ultimately, a few months after he began complaining about her treatment to Harper, Pushard moved the ADON into his office, and although Harper did not approve, he did not move her out of Pushard's office. (DSMF ¶¶ 32-35.)

In early 2015, Pushard reported to Harper that someone had told him that Nurse B may have sent paperwork outside of Riverview concerning a patient. (DSMF ¶¶ 37-38.) Pushard did not know for sure if anything had been sent, or what might have been sent, but was concerned that it could have been a HIPAA violation. (DSMF ¶¶ 39-40.) After receiving Pushard's report, Harper found out what information Nurse B sent outside Riverview and had Risk Management review it. (DSMF ¶ 46.) Risk Management did not find that it was a HIPAA violation. (DSMF ¶ 46.) Pushard and Harper never spoke about the transmittal of information after Pushard reported it. (DSMF ¶ 43.)

Pushard was aware that Riverview had policies mandating reports of any out-of-the-ordinary incidents and allegations of patient mistreatment. (DSMF ¶¶ 47, 51.) These policies, in their essence, describe that anything out of the ordinary, or that could potentially be a harm to patients, whether by affirmative action or omission of action, were to be reported through an Incident Report. A determination would then be made as to whether an investigation was warranted.[2] (DSMF ¶¶ 49-52.) The patient mistreatment policy highlighted that abuse or neglect could occur unintentionally, and that abuse or neglect could occur even when the patient suffered no harm. (DSMF ¶ 53.) All employees were subject to the policies which required them to immediately report "abuse, neglect

---

[2] Pushard objects to the policies as being inadmissible hearsay. The court determines that with an appropriate foundation these policies would fall under the business records exception to hearsay and therefore may be appropriately considered on this summary judgment record.

3

and exploitation, which they have witnessed or have knowledge of" to the appropriate person on duty. (DSMF ¶ 55.)

In March or April 2015, Pushard heard rumors that Nurse A was tired, having difficulty performing her job, and may have been diverting patients' medication. (DSMF ¶ 60.) Pushard was aware that Nurse A slept in her car on breaks. (PASMF ¶ 193.) Pushard did not report these rumors to Harper because he thought they were unfounded as they originated with a nurse who didn't like Nurse A, but he did ask the ADON to look into them. (DSMF ¶ 62.) Pushard states that he checked with the pharmacy to see if any drugs were missing, but none were. (PASMF ¶ 184.) The ADON reported this same information to him. (DSMF ¶ 63.) Pushard and the ADON thought Nurse A was working too many hours and was tired, so he took her off the mandated overtime list. (DSMF ¶ 65.) He also gave her sick leave and told her not to be in the medication room. (PASMF ¶ 65.) Sometime between February and April 2015 Pushard became aware that Nurse A had been disciplined by the Board of Nursing in the past, but he did not know for what. (SMF[3] ¶ 69.) Pushard did not report any of these allegations against Nurse A to anyone listed in the policies addressing out-of-the-ordinary incidents or patient mistreatment. (DSMF ¶ 67.)

In late May 2015, a psychiatrist and nurse supervisor at Riverview submitted written incident reports regarding Nurse A. (DSMF ¶ 72.) Within a few days of this report, Pushard emailed Nurse A telling her not to take any overtime as she had been tired, and for the same reason to refrain from giving patients medication. (DSMF ¶¶ 73-74.) On May 28, 2015, Nurse A was placed on administrative leave pending investigation. (DSMF ¶ 75.) Ultimately, the allegation against Nurse A for diverting medications was

---

[3] DSMF, PASMF, and the replies of the parties.

4

not substantiated, but the allegation of inattentiveness and/or sleeping on duty was substantiated and she was terminated from Riverview. (DSMF ¶¶ 121-23.)

Pushard and the ADON were placed on paid administrative leave on June 8, 2015, pending an investigation of allegations that they had prior knowledge of the concerns about Nurse A, failed to respond appropriately, and failed to appropriately report those concerns. (DSMF ¶¶ 77-78.) As part of its investigation, Human Resources reviewed emails and interviewed employees who said they reported concerns to Pushard as early as January 2015. (DSMF ¶¶ 79-88, 94.) When Human Resources interviewed Pushard, he said he did not remember if anyone had reported to him that Nurse A seemed impaired while on duty or suggested any other course of action than what he took.[4] (DSMF ¶¶ 82, 84.) The investigators did not find Pushard's failure to remember reports from employees credible.[5] DSMF ¶ 108. The report concluded that Pushard failed to appropriately report and act on the safety concerns reported to him, including failing to create a plan to monitor the safety issue but instead impermissibly relied on subordinate staff, the ADON, to do it. (DSMF ¶ 109.)

---

[4] Pushard objects to these facts as hearsay and claims that because some of these reports were unsubstantiated they are not relevant. The court disagrees. They fall within an exception to hearsay because they are business records, or not hearsay at all because they are not offered for the truth of the matter, but instead to show the basis of the investigation and why the decision-maker acted as he did. Further, even if the reports are unsubstantiated, that does not negate the fact that by policy, they were required to be reported so a decision could be made whether to investigate.

[5] Pushard again objects to this on hearsay and relevance grounds and denies it as inconsistent with other sections of the report that detailed the actions he did take. Many of the next facts are objected to and denied on these same bases. Given the court's conclusion in this case, however, these facts are not material.

Shortly after Pushard was put on administrative leave, on June 12, 2015, Harper initiated a Root Cause Analysis ("RCA"). (DSMF ¶ 96.) The purpose of an RCA is to look at barriers to reporting information within Riverview, whether nursing leadership promoted any of those barriers, and whether any information was covered up. (DSMF ¶ 96.) The RCA was completed in July 2015. (DSMF ¶ 95.) On August 26, 2015, after reviewing the investigative report and the RCA, then-Deputy Commissioner Ricker Hamilton ("Hamilton") recommended that Pushard be terminated. (DSMF/DSRMF ¶¶ 110-11.) Throughout Pushard's employment and investigation, Harper had weekly meetings with Hamilton and Pushard would often come up as a topic at these meetings. (PASMF ¶¶ 132-33.)

Pushard attended a "Loudermill" hearing with his attorney on September 17, 2015, and a separate director, Barry MacMillan, heard the information presented by Pushard and his attorney and reviewed it alongside the investigative report prepared by Human Resources.[6] (DSMF ¶¶ 113-14.) On October 9, 2015, MacMillan informed Pushard that she deemed his termination just and appropriate and his employment was terminated the same day. (DSMF ¶¶ 115-16.) Pushard became employed with Maine General Hospital as a nurse in November 2015 but he does not supervise anyone there. (DSMF ¶ 124, 128.) Since 1995 he has held supervisory nursing positions. (DSMF ¶¶ 4-9.)

## DISCUSSION

Summary judgment is appropriate on a WPA claim if the employer shows that there is no genuine issue of any material fact and that the employee's evidence does not establish a prima facie case for the elements of a WPA claim. *Brady v. Cumberland Cty.,*

---

[6] Despite Pushard's objection, this fact is relevant to show that an impartial person reviewed the information and found that Pushard's termination was just and appropriate.

2015 ME 143, ¶ 39, 126 A.3d 1145. To create a genuine dispute, the employee must present evidence creating a "triable issue" on each element. *Id.* "If the evidence in the summary judgment record would allow a jury to find for the employee on each element of the employee's case, then the employer is not entitled to summary judgment." *Id.* The evidence in the statements of fact and record references are viewed in the light most favorable to the non-moving party. M.R. Civ. P. 56(a), (c); *Platz Assocs. v. Finley*, 2009 ME 55, ¶ 10, 973 A.2d 743 (internal citations omitted). A fact is material if "it has the potential to affect the outcome of the suit." *Id.* For purposes of summary judgment, the employee has a "relatively light" burden of proving a prima facie case of retaliation. *Brady*, 2015 ME 143, ¶ 14, 126 A.3d 1145.

## I.      Retaliation in Violation of the Maine Whistleblowers' Protection Act

An employee plaintiff must show three elements to succeed in an action for whistleblower retaliation: (1) that he engaged in protected activity; (2) that the employer took adverse employment action against him; and (3) that there was a causal connection between the protected activity and adverse employment action. *Id.* ¶ 32. If the employee makes a prima facie showing of all three elements, then "the employer's evidence of a lawful reason for the adverse employment action . . . merely creates a dispute of material fact and precludes the court from granting summary judgment to the employee." *Id.* ¶ 35. It is appropriate for the court to seek guidance from federal jurisprudence to guide its analysis of WPA Claims. *Id.* ¶ 19 n.5.

### A. Are Pushard's Complaints Protected Activity Under the WPA?

The WPA provides that no employer is permitted to

> discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because . . . [t]he employee, acting in good faith . . . reports orally or in writing to the employer . . . .what the employee has reasonable cause to believe is a violation of a law [or] what the employee

7

has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual.

26 M.R.S. § 833(1)(A)-(B). The reported condition, activity, or practice does not have to "actually *be* unsafe or illegal; . . . an employee's reasonable belief that it crosses the line suffices, as long as the complainant communicates that belief to his employer in good faith." *Higgins v. New Balance Ath. Shoe, Inc.*, 194 F.3d 252, 261-62 (1st Cir. 1999). Protected activity has been found when the employee believes that she is bringing the issue to the employer's attention. *Cormier v. Genesis Healthcare LLC*, 2015 ME 161, ¶ 12, 129 A.3d 944.

Riverview argues that Pushard did not engage in any activity that was protected by the WPA for three main reasons. First, his conversations with Harper regarding staffing and his requests for hands-on nurse educators did not unearth or expose an unsafe practice and therefore do not amount to protected activity. Second, his objections to his supervisor's treatment of the ADON were not made under the reasonable belief that his supervisor's actions were illegal, therefore he cannot establish the required "good faith belief" to be protected under the WPA. Lastly, his lack of a good faith belief that confidential information constituting a HIPAA violation was sent outside of Riverview denies him protection under the WPA. Def.'s Mot. Summ. J. 11-14.

In response, Pushard argues that he was the most frequent and outspoken in opposition to Harper's decisions regarding staffing at Riverview and that he made specific objections to his supervisor's staffing decisions. Pl.'s Opp'n Summ. J. 1-2. Further, he asserts that he need not use legal terms to be protected by the WPA. He contends that his opposition of the treatment of the ADON as "retaliatory" is sufficient to fall within the WPA's protection, and that reporting a potential release of "confidential" information is enough to be protected under the WPA. Pl.'s Opp'n Summ. J. 12-13.

8

**B. Did Pushard Expressing His Concerns to Harper Regarding Hiring Acuity Specialists Instead of Mental Health Workers and that the Nurse Educators Should Have Been More Hands-On Instead of Academic or Administrative Amount to Activity that is Protected by the WPA?**

Whether Pushard voicing his differing opinion about how Riverview should have been staffed amounts to protected activity boils down to whether the WPA was designed to protect this type of "reporting." As Riverview points out, the fact that it was understaffed was commonly discussed within its four walls, at the State Legislature, and within the media. Riverview alleges that Pushard "did not believe that he was making anyone aware of anything they did not already know." Def.'s Mot. Summ. J. 2. Riverview advances this same argument in regard to Pushard's discussions with Harper about the nurse educators and where and how they should spend their time. Def.'s Mot. Summ. J. 2. Riverview asserts that Pushard cannot show he held a reasonable belief that a danger or illegality existed <u>and</u> that his report would bring the safety issue to Riverview's attention. Def.'s Mot. Summ. J. 11.

Riverview first cites to *Cormier v. Genesis Healthcare LLC*, 2015 ME 161, 129 A.3d 944 for support. There, after the employer reduced the number of Certified Nursing Assistants ("CNAs") on each shift, but still kept the required number of staff on per the regulations, the CNAs were not able to get to patients promptly when they called for assistance. *Id.* ¶ 2. The plaintiff CNA "believed that these delays put residents at a higher risk for falls because they would try to get out of bed by themselves." *Id.* Cormier made multiple reports of her concerns to the Director of Nursing, charge nurses, and a nurse educator. *Id.* ¶ 3.

The Law Court held that the Superior Court correctly determined that these reports were "protected activity" under § 833(1)(B) specifically. *Id.* ¶¶ 15-16. Cautioning

9

that although not every complaint that relates to safety triggers that provision, it clarified that section 833(1)(B)

> protects employees who, in good faith, make safety-related complaints when the employee reasonably believes that a dangerous condition or practice exists. A complaint is made in good faith if the employee's motivation is to stop a dangerous condition. A complaint is supported by reasonable cause when the employee has a subjective and objectively reasonable belief that a dangerous condition or practice exists.

*Id.* ¶ 11 (internal citations omitted). Cormier's presentation of evidence that she complained to supervisors about the understaffing conditions, coupled with the evidence that some patients were "harmed or exposed to harm" from the slowed response time due to the understaffing was "sufficient to support a finding that Cormier held a reasonable belief that staffing levels compromised the safety of the residents <u>and that her complaints would bring the safety issue to [her employer's] attention</u>." *Id.* ¶ 12 (emphasis added).

Here, Riverview points to the general knowledge of the public, media, and employees that Riverview had issues with being understaffed. Pushard's complaints touched on health and safety issues, but that is not the only requirement necessary to blow the whistle under the WPA. Pushard was not necessarily making Riverview aware of something that it did not know already, namely that there were staffing problems and a number of different approaches to take to solve those problems. Protected activity must be a report of a violation of law or an unsafe condition, and it must make the employer aware of something that it did not previously know. Otherwise the employee is not "blowing the whistle." That Riverview was aware of the staffing issues is made clear by the fact that it was subject to a consent decree regarding staffing.

In *Harrison v. Granite Bay Care, Inc.*, 811 F.3d 36, 48 (1st Cir. 2016), the First Circuit summarized the key facts in *Winslow v. Aroostook County*, 736 F.3d 23 (1st Cir. 2013) to

10

provide guidance to litigants in WPA cases. In *Winslow*, the First Circuit determined that the government itself, not the plaintiff, had uncovered potential violations of federal policies and brought that to the attention of both the alleged whistleblower and her supervisor. *Harrison*, 811 F.3d at 48. Based on that notification and under her supervisor's direction, the plaintiff sent out an email notifying the appropriate parties of the potential violation. *Id.* In addressing whether the plaintiff engaged in protected activity the First Circuit focused on the plaintiff's lack of intent to "expose an illegality" and instead focused on the fact that she was following her supervisor's orders. *Id.*

The plaintiff alleged that a second email, sent a few weeks after the first, and expressing her thoughts and concerns on the potential violation, was protected activity. *Id.* The First Circuit rejected this claim. *Id.* It held that this was not protected activity because "[b]y the time she sent the second email, the problem had been discussed in a public forum and the minutes of the meeting had been posted online for all the world to see." *Id.* Also important to the court was that her employer was not trying to "bury the problem of the violation," but instead to "acknowledge and deal with it." *Id.* (quoting *Winslow v. Aroostook County*, 736 F.3d 23, 32 (1st Cir. 2013)). Because her second email was addressed to people "who were already (or who easily could have become) aware of the problem [it] was clearly not intended to expose a potential illegality. Rather, [her] intent was to make sure her voice was heard and her opinion considered." *Harrison*, 811 F.3d at 48.

In the case at bar there is no dispute that Pushard "argued for the hiring of more mental health workers rather than acuity specialists," or that he was "actively involved in discussions with Harper regarding acuity specialist hiring." The same goes for his opinion that nurse educators should have been utilized on the floor with the patients and not in a classroom setting. Pushard does not show, however, that he was blowing the

11

whistle on, bringing to light, or exposing an unsafe condition or practice, or a violation of law. Pushard was merely voicing his opinions and had a policy disagreement with his supervisor.

This case is similar to *Winslow v. Aroostook County*, except that Riverview's staffing problems was more widely known and publicized than the violation of law that the plaintiff in *Winslow* attempted to report and claimed was protected activity. The staffing problems at Riverview could not have been subjected to a more public forum as the issue was addressed by the employees of Riverview itself, the Legislature, and the media. The courts even addressed the situation through a consent decree, supervised or monitored by a Court Master. Moreover, to the extent that Pushard alleges he was bringing to light a violation of law because it was unclear whether acuity specialists could be hired in place of mental health workers, the record reflects that Riverview was actively seeking guidance from the court to be sure that it complied with the consent decree on that very issue.[7] In short, Pushard blew no whistle nor shed light on any unsafe practice or violation of law.

To allow Pushard's conduct to amount to "protected activity" under the WPA, would invite litigation when employees have a differing opinion on a workplace problem and would undermine employers that are actively seeking a solution to that problem. Riverview and its employees, the Legislature, the courts, and the public were aware of the problem. Riverview was actively working under the consent decree to remedy it.

---

[7] Although not listed in either parties' Statement of Material Facts, in his deposition Harper indicated that acuity specialists were not addressed in the consent decree. Harper Dep. 22:20. During his time at Riverview, however, he was in the process of negotiating acuity specialists into the consent decree with the special master charged with enforcing the decree. Harper Dep. 23:20-23. This supports the view that Riverview was attempting to solve the staffing problem, not to hide it, but disagreed with the method Pushard believed was best.

Pushard, however, believed that his solution would be better. This is a policy disagreement, not a report of an unsafe condition or a violation of law. Pushard did not report a health or safety condition or a violation of law, but instead voiced his opinion on how to address a problem that was well known and thoroughly discussed by Riverview. Therefore, his disagreement with Harper on whether to hire acuity specialists or mental health workers and how nurse educators should be utilized does not amount to protected activity under the WPA. Since Pushard has not met his burden to show a prima facie case of protected activity, this court need not address whether there was a causal connection between Pushard's complaints and his termination.

### C. Were Pushard's Objections to Harper's Allegedly Retaliatory Treatment of the ADON Protected Activity Under the WPA?

Riverview argues that although Pushard objected to what he perceived as Harper's retaliation against the ADON by "(1) treating her in a disrespectful manner and (2) taking away her dedicated office space," that even if Pushard told Harper that those actions were wrong, he did not say or subjectively believe that they were illegal, and it would not have been reasonable for him to hold a good faith belief that those actions were illegal. Def.'s Mot. Summ. J. 13-14. In response, Pushard maintains that under the WPA he only had to report the condition, but not necessarily report that it was illegal. Pl.'s Opp'n Summ. J. 12. He further argues that "[t]he only question is whether the employee, himself, reasonably thought that the practice was illegal" and that Pushard's use of the words "retaliatory" clearly indicates that he thought it was illegal.

"A complaint is supported by reasonable cause when the employee has a subjective and objectively reasonable belief that a dangerous condition or practice exists." *Cormier v. Genesis Healthcare LLC*, 2015 ME 161, ¶ 11, 129 A.3d 944 (emphasis added). Caselaw is clear that the employee's subjective belief that a violation is occurring must

13

also be objectively reasonable. There is no dispute that both Pushard and the ADON discussed with, and complained to, Harper about the understaffing issues at Riverview and specifically his preference for acuity specialists rather than mental health workers. There is also no dispute that Pushard subjectively believed Harper "retaliated" against the ADON by treating her disrespectfully and depriving her of her own office. As discussed above in Section B, Pushard's complaints to Harper were not protected activity as he was not "blowing the whistle" because he did not shed light on or expose any unsafe condition. The ADON made the same complaints as Pushard.

Despite what Pushard subjectively believed, he could not have had an <u>objectively</u> reasonable belief that Harper was doing something illegal, namely retaliating against the ADON by acting cool towards her and reassigning her office space because the activity she engaged in was not protected activity. Just as Pushard was not bringing anything to light, neither was the ADON. This is reinforced by just how well-known the staffing problems at Riverview were. Because of that, it was not objectively reasonable to believe that Harper's actions towards the ADON were illegal, or "retaliatory." Since Pushard did not have an objectively reasonable belief that Harper acted illegally towards the ADON, his objection towards Harper's actions cannot amount to protected activity. Pushard has not met his burden to show a prima facie case of protected activity and, accordingly, this court need not address if there was a causal connection between his objections to Harper's treatment of the ADON and his termination.

### D. Was Pushard Telling Harper that a Riverview Employee Might Have Transmitted Internal Hospital Information to a Former Employee, When He Didn't Know if it Contained Confidential Information, Protected Activity Under the WPA?

To survive summary judgment, Pushard must show that he reasonably believed that an illegality occurred. *See Galouch v. Dep't of Prof'l & Fin. Regulation*, 2015 ME 44,

14

¶¶ 14-15, 114 A.3d 988. Here, it is not disputed that Pushard reported to Harper that he was concerned a nurse <u>might</u> have sent something outside of Riverview that <u>could</u> have concerned a patient, and if it did, it <u>could</u> have been a violation of HIPAA. He did not know what, if anything, had been sent outside of Riverview, or that patient information had actually been released, and the knowledge that something might have been sent out was second-hand knowledge. Based on this set of circumstances, it would be reasonable for Pushard to have a good faith belief that an illegality, a HIPAA violation, <u>may have</u> occurred. On these circumstances, however, Pushard could not have had a reasonable belief that an illegality <u>had actually</u> occurred based on this roundabout information. Therefore, Pushard's report to Harper regarding the possible transmittal of information that might have been confidential and therefore could have been a HIPAA violation is not protected activity under the WPA.

Because Pushard has not met his burden to show a prima facie case of protected activity, this court need not address whether there was a causal connection from his report of information transmitted outside Riverview and his termination.[8] Since none of Pushard's claims of protected activity survive summary judgment, whether Riverview is

---

[8] Assuming *arguendo* that Pushard's report was protected activity, Riverview has conceded that it terminated Pushard's employment effective October 9, 2015, and that termination is an adverse employment action under the WPA. Def.'s Mot. Summ. J. 10 n.2. Pushard still has not met his burden that there was a causal connection between the report of a potential HIPAA violation and his termination. Pushard lacks temporal proximity regarding this complaint. Pushard made this report in early 2015, many months before his termination. After this report, Harper and Pushard never spoke about the transmission of information again. Harper spoke to the nurse, got a copy of what she sent out, and gave it to Risk Management to review. Harper presumably followed protocol in passing along the potential violation to Risk Management and nothing further came of the incident. Nothing in the record shows that Pushard's report to Harper was part of his investigation. No record evidence reflects that Harper reacted negatively to this report in any way. Further, nothing in the record reflects that Hamilton, who ultimately terminated Pushard, was aware that this report had even been made. For these reasons, even viewing the evidence in the light most favorable to Pushard, no causal connection can be established from this early 2015 report of a potential HIPAA violation and his October 9, 2015, termination.

entitled to summary judgment on its affirmative defense that Pushard failed to mitigate his damages need not be addressed.

## CONCLUSION

The entry is:

The Defendant's Motion for Summary Judgment is GRANTED.

The Clerk is directed to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Dated: May 7, 2019

Justice William R. Stokes
Maine Superior Court

16